**E-FILED**
Tuesday, 28 September, 2004  04:44:27 PM
Clerk, U.S. District Court, ILCD

1

1        UNITED STATES DISTRICT COURT
      FOR THE CENTRAL DISTRICT OF ILLINOIS
2                URBANA DIVISION

3    RUFUS JOHNSON,

4                    Plaintiff,

5        -vs-                    No.  02 2260 .

6    STATEOF ILLINOIS DEPARTMENT
     OF CHILDREN AND FAMILY
7    SERVICES,

8                    Defendants.

9

10                DISCOVERY DEPOSITION

11        The deposition of RUFUS JOHNSON taken on

12    behalf of the Defendant at the Trade Centre,

13    Champaign, Illinois on September 14th, 2004,

14    before Deann K. Parkinson, Certified Shorthand

15    Reporter of the State of Illinois.

16

17                        CSR #84-002089

18    APPEARANCES:

19            MR. ROBERT KIRCHNER
              Attorney At Law
20            Trade Centre
              Champaign, IL  61820
21            Appearing for the Plaintiff

22            MS. STEPHANIE SHALLENBERGER
              Assistant Attorney General
23            500 South Second Street
              Springfield, IL  62706
24            Appearing for the Defendant
              217-785-4555

**EXHIBIT**

A

ORIGINAL

2

1

Also Present:  Mike Havera

2

3

4                    EXHIBIT INDEX

5

6       Exhibit No. 1....................Page 16

7       Exhibit No. 2...................Page 29

8       Exhibit No. 3...................Page 29

9       Exhibit No. 4...................Page 54

10      Exhibit No. 5...................Page 74

11      Exhibit No. 6...................Page 106

12

13

14

15

16

17

18

19

20

21

22

23

24

3

```
 1                    RUFUS JOHNSON,
 2    the deponent herein, called as a witness, after
 3    having been first duly sworn, was examined and
 4    testified as follows:
 5                  EXAMINATION BY
 6                  MS. SHALLENBERGER:
 7        Q.    Good morning, Mr. Johnson.  Could you
 8    please state your full name for the record?
 9        A.    Rufus Johnson, R-U-F-U-S, first name;
10    last name is Johnson.
11        Q.    Okay.  Mr. Johnson, as you know I'm
12    going to be asking you some questions today.
13        A.    Yes, that's correct.
14        Q.    I just want to set a few ground rules,
15    and it's for your benefit as well as mine.  If you
16    could answer a question yes or no, and not say
17    uh-huh or uh-uh, so we will know later on.
18        A.    That would be no problem.
19        Q.    Okay.  And also, if you do not
20    understand a question that I ask you, I just ask
21    that you just tell me that you don't understand
22    the question.
23        A.    Be no problem.
24        Q.    So, we have those ground rules
```

4

```
 1    established.
·2         A.    Okay.  That would be fine.
 3         Q.    Okay.  Mr. Johnson, what did you do to
 4    prepare for this deposition today?
 5         A.    I did nothing basically to prepare for
 6    it.
 7         Q.    Did you look at any documents?
 8         A.    Basically everything is in my head.  I
 9    lived through the situation, so I didn't need to
10    prepare for it.
11         Q.    Okay.
12         A.    I've been drilled in and out of my head
13    for a couple years now since I made my claim.
14         Q.    So you did not look at any documents?
15         A.    Not really.  I mean, basically
16    throughout the past couple years that this
17    situation occurred, I mean it's in my head.  It's
18    ingrained in my head.  I lived through this
19    situation.
20         Q.    Okay.  Let me narrow it down to a time
21    period.  In the last two weeks did you look at any
22'   documents in preparing for the deposition today?
23         A.    No, I didn't.
24         Q.    Okay.  All right.  I'm just going to go
```

5

1    through some background information right now.

2    Where did you graduate high school?

3        A.    I graduated high school from St. Louis,

4    Missouri.

5        Q.    Okay.  And are you an Illinois resident

6    now?

7        A.    Yes, I am.

8        Q.    And did you go to college after high

9    school?

10        A.    Yes.

11        Q.    And where did you go to college?

12        A.    Illinois State, undergraduate and

13    master's.

14        Q.    You received your bachelor's degree?

15        A.    Yes.

16        Q.    And what did you receive that in?

17        A.    In MS.

18        Q.    A particular field of study?

19        A.    Counseling education psych.

20        Q.    What did you do after college?

21        A.    What did I do after college?  I

22    basically-- I worked for a friend for a couple

23    years at his restaurant.  And then I went to

24    graduate school, and then I eventually worked a

6



```
 1      job at the youth services, it no longer exists, in
 2      Bloomington Normal.  Then I worked a job in
 3      Peoria, I worked two jobs as a psychotherapist and
 4      also a youth counselor.  Then I got hired by DCFS
 5      back in 1994 or '93, in December.
 6          Q.    Okay.  So basically you have worked for
 7      the Department of Children and Family Services
 8      since 1993?
 9          A.    '93 and '94.
10          Q.    Okay.
11          A.    It's going to be 11 years.  I think it
12      was '94 of December to the best of my
13      recollection.
14          Q.    Okay.  And do you still work for the
15      Department of Children and Family Services?
16          A.    Yes, I do.
17          Q.    Okay.  Let's go ahead and start with
18      1993.  What position did you take with the
19      Department of Children and Family Services?
20          A.    I got hired as a child protection
21      investigator.
22          Q.    And that was in 1993?
23          A.    '93 and '94.
24          Q.    And where were you hired?
```

7

1        A.    I went to a place at the University Inn

2    right down here in Champaign.  They had a

3    statewide hiring, had like over 100, 200 people

4    there, and I got hired, the lady told me I was

5    going to get hired automatically because I did

6    well in my interview.  Then six months later they

7    called me around December to hire me.

8        Q.    And what field office were you hired to

9    work out of?

10       A.    She suggested I go to Urbana-Champaign

11   because they had a high turnover rate.  And I

12   would get in there quicker.

13       Q.    And when you say "she", do you recall

14   who told you that?

15       A.    She was a supervisor out of Bloomington.

16   Child protection supervisor.  I can not remember

17   her name.  I think she retired or she moved on

18   after I got hired to a different area.

19       Q.    Okay.

20       A.    With the department.

21       Q.    So, your first job then was out of the

22   office, the Urbana-Champaign field office?

23       A.    Right.  That's correct.

24       Q.    Okay.  And am I correct to say that

8

1        there are actually two separate offices, Urbana

2        and Champaign?

3            A.    No, that's the same one.

4            Q.    It's the same one?  And today are there

5        two separate offices or is it just one?

6            A.    It's the same office, but they have like

7        different like licensing division, they have a

8        main office, a regional office off of First

9        Street, would have like the environmental

10       protection, they have a whole list of different

11       agencies in that building.  But as far as DCFS

12       child protection, it's in one house in one office.

13           Q.    Okay.

14           A.    With case workers.

15           Q.    Okay.  Only case workers in that office?

16           A.    Case workers and investigation.

17       Investigation is on the bottom floor.  Case

18       workers upstairs.

19           Q.    Is that how it was in 1993?

20           A.    Yes, that's correct.

21           Q.    Okay.  And so you took the job in the

22       Urbana-Champaign field office; were you living in

23       Champaign-Urbana?

24           A.    No, I never lived in Champaign-Urbana.

9

| 1 | Q. | Where were you living in 1993? |
| 2 | A. | I lived in Bloomington Normal. |
| 3 | Q. | Okay. And are you married? |
| 4 | A. | No, I'm not. |
| 5 | Q. | Were you married in 1993? |
| 6 | A. | No, I came close to it but walked away. |
| 7 | Q. | Do you have any children? |
| 8 | A. | I have one. |
| 9 | Q. | One child? And what is his or her name? |
| 10 | A. | John. |
| 11 | Q. | And how old is John? |
| 12 | A. | Eleven. |
| 13 | Q. | And does John live with you? |
| 14 | A. | No, he lives with my girlfriend, |

15    ex-girlfriend.

| 16 | Q. | Do you share joint custody? |
| 17 | A. | No, I do not. |
| 18 | Q. | Okay. So 1993 you took your first job |

19    in the Urbana-Champaign field office as a child

20    protective --

| 21 | A. | That's correct. |
| 22 | Q. | -- investigator? |
| 23 | A. | Uh-huh. |
| 24 | Q. | And could you explain your job duties as |

10

1  a child protective investigator?

2      A.  Basically what you do, you get a call
3  from the hot line, SCR, state central register,
4  and they dispatch reports throughout the State of
5  Illinois.  And what your job entails you do sex
6  abuse investigations.  You do from dirty home
7  investigations, to a shaken baby, to hematomas,
8  broken bones, burns.  So you do a wide variety of
9  different investigations.  You evaluate risk to
10  children, the immediate and urgent necessity you
11  take custody of the child and you take it into
12  court.  But you got to have immediate and urgent
13  necessity and reasonable efforts of where you got
14  services for the family to prevent this from
15  occurring.

16          So that's basically what it was.  Then
17  you would indicate reports on different families
18  if you felt -- indicated means there's credible
19  evidence of abuse and neglect.  People got a
20  history, then two or three reports maybe possible
21  they could lose their kids.  So that's basically
22  what we did in the office.

23      Q.  And is that what you currently do now?
24      A.  Yes.

11

1        Q.    Okay.  And in 1993 do you recall who

2    your supervisor was?

3        A.    Debbie Tullis when I first started, she

4    hired me.

5        Q.    And do you know the race of Debbie

6    Tullis?

7        A.    She was white.

8        Q.    Okay.  After 1993, what was your next

9    job with the Department of Children and Family

10   Services?

11       A.    I stayed in investigations.

12       Q.    Okay.  So, my understanding is you

13   stayed in investigations, but you've moved around

14   and had different supervisors?

15       A.    Yes, that's correct.

16       Q.    Okay.  Does the department of children

17   and family services, do they assign you to

18   different teams?

19       A.    Yes, that's correct.

20       Q.    And do you recall in 1993 the other

21   child protective or child protection, I believe

22   it's called, investigators that was on your team?

23       A.    Yes.

24       Q.    Can you state those names for me.

12

1          A.    It was Mike, you mean when I first got

2     hired initially?

3          Q.    Yes?

4          A.    Mike Fett, F-E-T-T, a guy named Steve

5     Sizemore, Stacy McAdams. Let me recollect. Did I

6     give you Steve Bryson?

7          Q.    No, you did not.

8          A.    Okay. Mary Ann Pointer. Let me

9     recollect who else was. I got to think back. Who

10    else was there? So many people left that office,

11    let me recollect. Those are the people I remember

12    with me there. But it was more people. There was

13    more team there.

14         Q.    Okay. And all of these people that you

15    have just named were child protection

16    investigators?

17         A.    Right.

18         Q.    Okay. All right. Do you recall the

19    next time since 1993 that you were switched to a

20    different team with a different supervisor?

21         A.    To answer your question, I was with

22    Debbie Tullis for a little over three years. Then

23    I switched teams with Kitty Mall. She had other

24    units. She became a supervisor.

13

1       Q.    Okay.  Do you recall the race of Kitty

2   Mall?

3       A.    She was a white female.

4       Q.    So you were under the direction of

5   Debbie Tullis for approximately three years; do

6   you recall how long you were under the direct

7   supervision of Kitty Mall?

8       A.    It was about a -- Kitty was about a

9   year, year and a half tops.

10      Q.    So, does that bring us to approximately

11  1997-1998?

12      A.    Yeah, I think so.

13      Q.    Okay.  Do you recall your next

14  supervisor after Kitty Mall?

15      A.    Yes, it was Nora Harms.

16      Q.    Nora Harms?

17      A.    Yeah, last name H-A-R-M-S.

18      Q.    Okay.  So, Nora Harms was your

19  supervisor in approximately 1998?

20      A.    Somewhere, yeah, right about

21  two-and-a-half years she was with me.

22            MR. KIRCHNER: Did you say '98 or '88?

23      A.    She did say '88.  You meant 1998?

24      Q.    I meant '98, yes?

14

1       A.    Yes, I think I had Kitty, I mean Nora

2    for about two-and-a-half years.  She came from

3    follow-up.  She was new to investigations.  It was

4    about '98 until--

5       Q.    Okay.  Do you know the race of Nora

6    Harms?

7       A.    She is a white female.

8       Q.    And do you recall how long Nora Harms

9    was your immediate supervisor?

10      A.    Two-and-a-half years, I think.  To the

11   best of my recollection.

12      Q.    Okay.  Do you know the immediate

13   supervisor of Nora Harms during the time that Nora

14   Harms was your supervisor?

15      A.    Yes, her immediate supervisor was at the

16   time Pam Miller.  No, Maria Miller.  She was the

17   DCP manager at the time.  Because John House left

18   to take another position.  I believe it was Maria

19   Miller because she just got promoted.

20      Q.    Do you recall Maria Miller's immediate

21   supervisor?

22      A.    That would be, her immediate supervisor

23   would be Deb Kinney, the regional manager out of

24   Peoria, the regional office.  She runs the whole

15

1    central region.

2        Q.    Okay.  And at some time do you recall

3    the time where Maria Miller was replaced with a

4    Jamie Ralph?

5        A.    Yes, I do.

6        Q.    Okay.  Do you recall that time period?

7        A.    I think it was between, I want to say to

8    the best of my recollection between 2000 and maybe

9    2001.  Right in there.  1999 to 2001 to the best

10    of my recollection.

11        Q.    Could it have been around March of 2001?

12        A.    I think you're correct.  Right.

13        Q.    So, approximately March of 2001 Jamie

14    Ralph was the immediate supervisor of Nora Harms?

15        A.    Yes, I think you're correct.

16        Q.    And approximately in that time period

17    Nora Harms was your immediate supervisor?

18        A.    Correct.

19        Q.    Okay.  And then during that time also,

20    the time period of February, March, 2001, would

21    Becky Jones have been Jamie Ralph's supervisor?

22        A.    Yes, she just got recently promoted to

23    assistant regional manager, administrator to Deb

24    Kennedy.

16

1          Q.     Okay.  Do you recall the race of Becky

2     Jones?

3          A.     White female.

4          Q.     I may have already asked you the race of

5     Deb Kennedy, if you know.

6          A.     She is African American.

7                 (Whereupon, Deposition Exhibit No. 1 was

8     marked for identification.)

9          Q.     Mr. Johnson, I'm going to hand to you an

10    exhibit which is marked as exhibit 1.  Do you

11    recognize that?

12         A.     Yes.

13         Q.     And what do you recognize that to be?

14         A.     This was an initial complaint.

15         Q.     Your charge of discrimination that you

16    filed with the EEOC?

17         A.     Correct.

18         Q.     Is that your signature on the bottom of

19    the form?

20         A.     Correct.

21         Q.     And is that your writing that has dated

22    12-18-01?

23         A.     Correct.

24         Q.     Okay.  And I would like to direct your

17

1       attention to the box that has date of

2       discrimination took place.

3           A.    Okay.

4           Q.    Do you see that?

5           A.    No, I don't.  Could you point that out.

6           Q.    Right here, the date discrimination took

7       place.

8           A.    Okay.

9           Q.    It's my understanding that you were

10      complaining that there was some racial

11      discrimination or a hostile work environment in

12      the Urbana field office, is that correct?

13          A.    Yes, that's correct.

14          Q.    Okay.  So when you filed this complaint

15      of discrimination on 12-18-01, had you ever prior

16      to this date filed a complaint with either your

17      supervisor, with the Department of Children and

18      Family Services, or with any other person

19      regarding the race discrimination at the Urbana

20      field office?

21          A.    Others have talked about race

22      discrimination in the office, but some workers, I

23      never filed a complaint, but I have voiced my

24      opinion like to Nora about the unfair treatment of

18



```
 1          how case distribution was going on and how they
 2          would have my white counterparts get less cases
 3          and I would seem to get a lot more.
 4               Q.    And you voiced this opinion to who?
 5               A.    To Nora.
 6               Q.    Nora Harms?
 7               A.    Yeah.
 8               Q.    And when did you voice your opinion?
 9               A.    Probably it was several times during the
10          year to the best of my recollection.
11               Q.    What year?
12               A.    Probably was in the year of, between '98
13          and 2000.  So, we have a team of -- other team
14          have five people.  And my team had four.  And a
15          lot of the occasions I would be only one left in
16          rotation, other people would be off because they
17          were either stressed out or they were sick a lot.
18          And I come show up for work.  And I would be
19          handling all of my unit's case load coming in.
20          And it would be like working overtime.
21               Q.    You just referred to that you have
22          teams, and then you would handle your unit's case
23          load; is your unit and team the same?
24               A.    My team consisted of four people.
```

19

1    Q.    Okay.  And who were those four people?

2    A.    It was Stacy McAdams, Steve Bryson, it

3    was me, and there was a guy we hired, his name

4    was, what was that guy's name?  I got it in my

5    head.  He was half Asian.  I can't recall his

6    name, but he just got hired at that point on our

7    team.  I got it in my head.  I can't recall it.

8    Q.    And when was this period of time that

9    these four individuals worked on your team?

10    A.    I would say between when Kitty Mall

11    started, took a position when I first went to

12    Kitty Mall's team, Steve Bryson, me and Stacy.

13    Then we had another position open.  It was -- his

14    name was Harmon.  Dave Harmon was the other guy

15    that came down and was hired.

16    Q.    Okay.  So, we're talking about a time

17    period between 1998 and 2000?

18    A.    Right.

19    Q.    Okay.  So, other than voicing your

20    opinion to Nora Harms during 1998 to 2000

21    verbally, did you ever file any written complaints

22    with anyone?

23    A.    No, I did not.

24    Q.    No written complaints regarding racial

20

1     discrimination?

2         A.    Basically we had people in my office

3     wanted to have a meeting because they were

4     discontented with the environment of the office.

5     And this was black workers. I didn't go to the

6     meeting because I couldn't get no resolution

7     there, I was going to take action, so I didn't go.

8         Q.    And when was this meeting?

9         A.    Basically it occurred between that

10    period I talked to you about, between when I was

11    on Kitty's team to Nora came in.

12        Q.    Sometime during the period of 1998 to

13    2000 a meeting occurred in the office?

14        A.    Not in the office. It was off at one of

15    the co-workers, I believe it was at one of the

16    co-worker's homes. Let me bring her name up. Her

17    name was -- she is still at the office too.  I

18    can't recall her name at this point, but they had

19    a meeting and it was mostly black females that

20    were attending the meeting. And her name was

21    Carol Davis Hargest.

22        Q.    But you did not attend the meeting that

23    occurred sometime between 1998 to 2000?

24        A.    I didn't see no need to attend that

21

1    meeting because I could get nothing out of that

2    meeting, but nothing to support my case.  There

3    would be no action taken with these individuals is

4    what I felt.

5         Q.    Okay.  And how did you know that only

6    females attended this meeting?

7         A.    Because Carol David Hargest and Marsha

8    Carter, she is one of my co-workers, no males

9    showed up.  It was one other black male in the

10   office, it was Mo Jollo (phonetic), I know he

11   didn't attend.



12        Q.    Did someone tell you that females

13   attended this meeting?

14        A.    Yeah, it was basically the rest of it

15   was females.  There was only two black males and I

16   know he didn't attend.  And it was all females

17   there, black females at the meeting.

18        Q.    Okay.  Do you know what was discussed at

19   this meeting?

20        A.    Basically, to the best of my

21   recollection, from Marsha Carter and Carol David

22   Hargest they discussing the ongoing situation of

23   the Urbana field office of how blacks were being

24   treated compared to our white counterparts.

22

1           Q.    And Marsha Carter or Carol Davis Hargest

2      told you this?

3           A.    Yes.

4           Q.    So, the exhibit that you have in front

5      of you, your EEOC charge, is the first time that

6      you filed a complaint alleging racial

7      discrimination?

8           A.    That's correct.

9           Q.    Going to direct your attention to the

10     date of discrimination took place.

11          A.    That was -- right, go ahead.

12          Q.    And it says the earliest date is

13     February 8th of 2001.  Is that correct?

14          A.    I think so, but I think the date was

15     kind of fuzzy to tell you the truth when we first

16     made the thing because I was in a rush to get it

17     done.  My Union rep was helping me with the

18     situation so I don't think that was really a

19     correct date.  He just told me to get the stuff

20     in, boom, they got it in, we got the charge filed.

21          Q.    Were you told to review this, the OC

22     charge, before you signed it?

23          A.    Yeah, I did.

24          Q.    Okay.

23

1        A.    I reviewed it.

2        Q.    And in your EEOC charge, you state that

3    on or about June 2, 2001, you were accused by a

4    supervisor of violating a company policy, and was

5    given discipline.  Do you recall what company

6    policy you were accused of violating?

7        A.    Yes, I can recall that.

8        Q.    Okay.

9        A.    It came a situation -- do you want to

10   recall the company policy?  What do you want

11   first?  You can tell me.

12       Q.    Okay.  I would like to know first of all

13   on or about June 2, 2001, what were you accused of

14   violating?

15       A.    Basically it had to do with a case

16   called Cannis, Jesus Cannis where I had a

17   conversation with Mrs. Dawn Bachtold, she is the

18   DPO, that means the follow-up supervisor in the

19   Urbana field office, she had an open case with

20   this family and had a prior -- she was the prior

21   case worker with this family.

22             We had a conversation, she was in my

23   door of my office, and I asked her because I

24   needed to have a contact with her, to close my

24

1    case because she was the OPWI.   The

2    OPWI is the other person with information.   And

3    Nora Harms called the report.   We had to have a

4    conversation with her.   I had a brief conversation

5    with her about the content of the narrative part,

6    and after that, two weeks later she goes to my

7    file, I close the case out, she tells me that I

8    falsified stuff, that we never had a conversation.

9    But we did have a conversation in my doorway

10   because she was racing off to go do something,

11   that is what she was claiming.   So, that's what I

12   filed.

13            I was charged with misrepresentation,

14   the professional term they put it, of K 1780

15   that's an interview note, an investigator

16   interview note.   And that's what the charge was.

17   So she recollected two weeks ago after I wrote

18   down simultaneous what we talked about.

19        Q.   Okay.   Mr. Johnson, are you sure that

20   that happened in 2001, or could that have happened

21   actually in 2000?

22        A.   Yeah, it probably was 2000.

23        Q.   Okay.   So, as far as this charge of

24   discrimination goes, was there another, around on

25

1    or about June 2, 2001, that you were accused of

2    violating a confidentiality policy?

3        A.    Oh, you talking about that one?  Okay.

4    I'm sorry.  I went back to that one too.

5        Q.    I want to know what around June 2, 2001,

6    you state?

7        A.    Okay.  This is another incident.  I'm

8    sorry.  I just got all of them in my head.  I know

9    what you are talking about.  I went out on a case

10   involving Sandy Gauze.  I went off on a wrong

11   tangent, I'm sorry.  And Sandy Gauze was a foster

12   parent.  The case came in unknown.  And with that,

13   we go out and investigate the case.  I go out to

14   the residence, I find that Mrs. Gauze has one of

15   my co-worker's kids in her home as a day care

16   provider.  When I go out to the home I was like,

17   this is a conflict of interest.  She has been

18   accused, once I found out who it is.

19            I go back to the office, try to speak

20   with Debbie Tullis.  She was only supervisor there

21   because Nora, she was gone at the time on

22   vacation.  And Debbie was busy, told me to come

23   back.  She was in a conference doing something.

24   And I go back to my office, and basically in my

26

1    office I share office with Heather Forest, she is

2    my co-workers, and Carol David Hargest, she was in

3    there too talking because she is the next office

4    over.

5                Lisa Sanders was there, who is a case

6    worker, who was also on Dawn Bachtold's team.  She

7    was present, and I go to my office, sometimes we

8    run stuff across each other.  And I told like

9    Heather then what I found out there inside my

10    office, that I shouldn't have this investigation

11    because this is involving a co-worker's kid.

12                And from that point what I was accused

13    of, I was accused of breaching confidentiality.

14    And spreading stuff throughout the office.  That's

15    what I was accused of, breach of confidentiality.

16        Q.    Okay.  Did you receive any discipline?

17        A.    Yes.

18        Q.    And what did you receive?

19        A.    I got like a thing in my file saying

20    that I breached confidentiality.  Like a written

21    reprimand in my file.

22        Q.    Was that an oral reprimand?

23        A.    Yes.

24        Q.    Okay.  And so this is what, the incident

27

1          that you just described, the breach of

2          confidentiality, is that what you are describing

3          in your EEOC charge on June 2nd --

4                A.    Yeah, that's correct.

5                Q.    Please wait until I'm finished again so

6          she can record this.  And then you also say that

7          your nonblack co-workers violated the same policy,

8          the breach of confidentiality, and never have been

9          disciplined.  Now, can you tell me what co-workers

10         that you were talking about in your EEOC charge?

11               A.    I'm talking about Lisa Sanders, talking

12         about Pam Wendt; and it was another person on Dawn

13         Bachtold's team; I forgot her name.

14               Q.    Could it have been Sandra Skully?

15               A.    Yeah, Sandra Skully.

16               Q.    And do you know if Lisa Sanders was a

17         child protection investigator?

18               A.    She was a case worker.

19               Q.    She was a case worker?

20               A.    All of them were case workers.

21               Q.    Do you know if Pam -- okay, you just

22         answered my question.  Pam Wint, Sandra Skully and

23         Lisa Sanders were all case workers?

24               A.    Correct.

28

1        Q.    So, does case workers have different job

2    responsibilities than child protection

3    investigators?

4        A.    Correct.

5        Q.    Okay.  So, did Lisa Sanders, Pam Wendt

6    and Sandra Skully have different immediate

7    supervisors than you did?

8        A.    Yes, they did.

9        Q.    And who were their immediate

10   supervisors?

11       A.    Dawn Bachtold.



12       Q.    And your immediate supervisor during

13   this relevant period of time around June 2, 2001

14   was Nora Harms?

15       A.    Correct.

16       Q.    And you said that they never received

17   any -- and they were not disciplined for breaching

18   confidentiality?

19       A.    No, they were not.

20       Q.    Did you file a grievance regarding your

21   oral reprimand that you received as a result of

22   the breach of confidentiality?

23       A.    Correct.

24       Q.    Okay.

29

1              (Whereupon, Deposition Exhibit No. 2 was

2    marked for identification.)

3         Q.    I'm handing you exhibit 2.  Do you

4    recognize that?

5         A.    Yes.

6         Q.    What do you recognize that to be?

7         A.    My grievance I filed for breach of

8    confidentiality.

9         Q.    Okay.  Do you see under step two, where

10   it says that to resolve your grievance that

11   management agrees to reduce the oral reprimand to



12   a counseling session.

13        A.    Yes.

14        Q.    Okay.  Do you recall if you actually

15   received the counseling session?

16        A.    Yes, I received a counseling session.

17        Q.    Okay.  So, it was your understanding

18   that you no longer had the oral reprimand and it

19   was reduced to an oral counseling?

20        A.    That's correct.

21        Q.    Okay.

22              (Whereupon, Deposition Exhibit No. 3 was

23   marked for identification.)

24        Q.    Handing you Exhibit 3, do you recognize

30

1      that?

2          A.    Yes.

3          Q.    Okay.   And this appears to be an inter

4      office correspondence to you from Jamie Ralph who

5      was the child protection manager dated May 23,

6      2001.

7          A.    That's correct.

8          Q.    Okay.  And in this memo it reflects that

9      you received a counseling session regarding the

10     confidentiality, is that correct?

11         A.    That's correct.

12         Q.    Okay.   And is this the discipline that

13     you speak of in Exhibit 1, your EEOC charge that

14     you received?

15         A.    That's correct.

16         Q.    Also in your EEOC charge you state that

17     your job performance and work is constantly being

18     scrutinized by your supervisors, while your

19     nonblack co-workers are not subjected to similar

20     treatment.   Could you describe to me what

21     specifically you're talking about in this EEOC

22     charge that your job performance and work was

23     constantly being scrutinized?

24         A.    Yes.   For example, I had a co-worker who

31

1      was like -- her name was Lynda Morgan, this a

2      different Lynda Morgan from the other one, she

3      lost five files in a mall parking lot.  She

4      received no formal discipline.  Nothing was

5      happening.  They said it was okay.  They redid the

6      thing.

7           Q.    Okay.

8           A.    I can give you some other examples.

9           Q.    Okay.  Let's go one by one.  Do you know

10     the race of Linda?

11          A.    White female.

12          Q.    White female; and do you know when she

13     lost the five files?

14          A.    It was in a period of time where I was

15     going on with my complaint.  I think it was the

16     last year that I was there, she lost those five

17     files.

18          Q.    Okay.  Now, were you ever disciplined

19     for losing any files?

20          A.    I never lost a file.  I knew what would

21     happen.

22          Q.    So, you think that this time period that

23     Miss Morgan lost the files was--

24          A.    It was within the framework of the last

32

| | |
|---|---|
| 1 | year I was there. |
| 2 | Q.   Okay.   Which would have been 2001? |
| 3 | A.   Yeah. |
| 4 | Q.   And when did you leave the Urbana field |
| 5 | office? |
| 6 | A.   I left in, I think I left March 4th was |
| 7 | my first day in Aurora. |
| 8 | Q.   March 4th, 2002? |
| 9 | A.   Yes, that's correct. |
| 10 | Q.   Okay.   Okay.   So, we have Lynda Morgan |
| 11 | lost five files.   Do you recall any other specific |
| 12 | instances where your work was being scrutinized? |
| 13 | A.   Yes.   I mean, basically I mean I had got |
| 14 | a high case load because she had a lot of people |
| 15 | missing work, wasn't showing up, where I had a lot |
| 16 | of my other white counterparts, they was out of |
| 17 | rotation, they was taken out of rotation.   What I |
| 18 | mean is that for an investigation when cases come |
| 19 | up, they would take them out of of rotation.   They |
| 20 | took Steve Bryson out of rotation.   They took Jan |
| 21 | Warwick.   They took Mary Ann Pointer, Chad |
| 22 | Cochran, all my white counterparts out of rotation |
| 23 | to get their cases done.   And I never had that |
| 24 | luxury to be taken out of rotation. |



33

1      Q.    Did you ever request to be taken out of

2    rotation?

3      A.    I told Nora they need to slow down, but

4    she said right now we couldn't afford to do it.

5      Q.    When did this occur?

6      A.    This occurred within the framework of

7    when she was the supervisor.  Because we were

8    always short of people.  People were constantly

9    rotating in and out of that office.

10      Q.    Okay.  And do you recall when Miss Nora

11    Harms became your supervisor?



12      A.    Like I said, back between '98 and '99,

13    in that time frame.  For about two-and-a-half

14    years.

15      Q.    Okay.  So, specifically when you speak

16    of that Steve Bryson and Jan Warwick was taken out

17    of rotation?

18      A.    Mary Ann pointer.  Chad Cochran.

19      Q.    Okay.

20      A.    I mean, this just didn't happen for a

21    brief period of time.  This happened constantly.

22    Where Mary Ann Pointer, with Steve Bryson, Jan

23    Warwick, they were constantly behind.  I had to

24    work off the clock to get my stuff caught up while

34

1        these other people had time during the regular

2        business hours to get caught up.

3            Q.    So you're alleging this happened between

4        1998 to the time that you left?

5            A.    No, Mary Ann pointer and Chad Cochran,

6        this stuff and some other people, it happened in

7        like from '95 to the present before I left.

8        Because I mean Mary Ann Pointer had like 50, 60

9        cases and Steve did too.  And some of these people

10       it was outrageous.  And they never was

11       disciplined.  See, we got certain guidelines and

12       rules, I don't mean to get off point here, but we

13       got like 60 days to get a case in exclusively.  To

14       get it done.  Then 30 days, they like to have it

15       in that framework.  And normally people approach

16       you with discipline if you are not getting your

17       work done and taken out.  For me to get a case

18       extended, it was tough.

19           Q.    Okay.  We will come back to that.  As

20       far as Steve Bryson and Jan Warwick and the other

21       names that you had listed previously, were they in

22       your same team?

23           A.    Steve Bryson was on my team.

24           Q.    And am I correct in saying that the

1          people who were -- the child protective

2          investigators who were on the same team had the

3          same immediate supervisor?

4               A.    Right.

5               Q.    So, if a person was on a separate team

6          would they have a different immediate supervisor?

7               A.    Yes, they would.

8               Q.    Okay. So I want you to tell me the

9          members who you think of your team that was taken

10         out of rotation? Not other teams, just your team.

11              A.    I was on a team with Mary Ann too for

12         like three years when I first came.

13              Q.    Okay.  So this is a period of 1993 to

14         1996?

15              A.    Right.  And also, yeah, that's correct.

16              Q.    Okay.

17              A.    And there was other people too that I

18         can't recollect, other white co-workers, I can't

19         recall their names because that was a period of

20         time of people coming and go so quick.

21              Q.    Okay.  Let's go from the period of 2000.

22         Can you tell me who was on your team, in let's

23         just say the year 2000?

24              A.    Stacy McAdams, Carol Davis Hargest, me,

1       Heather Forest and me.  Two black females and one

2       white female, that would be Heather Forest.

3               Q.   Okay.  Carol Davis Hagest, is she a

4       black female?

5               A.   That's correct.

6               Q.   Okay.  And Stacy?

7               A.   Black female.

8               Q.   Heather Forest?

9               A.   She is white female.

10              Q.   And were there any other people on your

11      team that you can recall during the year 2000?

12              A.   Dave Harmon came at one point in time,

13      but he came before Heather.

14              Q.   What was the race of Dave Harmon?

15              A.   That's a tough question to answer.  He

16      was half Asian and half Caucasian, but he

17      preferred to be being put down as Caucasian.  So,

18      I'm just being honest.  That's a tough question to

19      answer right there.

20              Q.   Okay.

21              A.   That's what he preferred.

22              Q.   Okay.  Of these four individuals that

23      were on your team, Stacy, what was her last name?

24              A.   McAdams.

37

```
 1            Q.     Okay.  Carol Davis Hargest, Heather

 2       Forest and Dave Harmon, were these people taken

 3       out of rotation during the year 2000?

 4            A.     During the year 2000?  No, those people

 5       were not taken out.  I know they slowed up on

 6       cases on them at periods of times because they

 7       were going -- they slow up on cases.

 8            Q.     Okay.  In the period of 2001, did you

 9       have the same people on your team?

10            A.     To the best of my recollection I

11       couldn't tell you, I couldn't answer that  because

12       it was a fine line because Carol became -- Carol

13       came, not Carol, but Heather came after Dave left.

14       And like I said, people rotate in and out so

15       quick.

16            Q.     Okay.  So the period of 2001 do you

17       recall any of your team members being taken out of

18       rotation?

19            A.     To the best of my recollection, it was

20       Steve Bryson, he was taken out a lot.

21            Q.     Was Steve on your team?

22            A.     Yes, he was.

23            Q.     Okay.  During 2001?

24            A.     Yeah, I think, yeah.  He was still
```



38

1      there.

2          Q.    Okay.

3          A.    You just got to understand the time

4      frames the way people went in and out of that

5      office; it's incredible.

6          Q.    High turnover?

7          A.    Worse than that.

8          Q.    Right.

9          A.    And Steve was constantly out of rotation

10     to catch up.

11         Q.    So, did you feel that Steve Bryson was

12     being treated better than you because of his race?

13         A.    Yes, I did.

14         Q.    And why was that?

15         A.    Because I never got the opportunity to

16     be taken out of rotation to catch up on my work.

17     I always got extra work, and always had like, you

18     know, hey, if you don't get this done, hey, they

19     can discipline you.  You know.  They watching you.

20         Q.    And who said that to you?

21         A.    Nora Harms said that to me many a times.

22         Q.    Nora Harms stated to you, do you know if

23     she stated to anyone else that you would be

24     subject to discipline if you did not get your work

39

1        done on time?

2            A.    No, she stated it to me.

3            Q.    Okay.

4            A.    They were watching me.  She was talking

5        about Becky Jones, Jamie Ralph.  She was talking

6        about them.

7            Q.    So you are saying that Nora Harms told

8        you that supervisors were watching you?

9            A.    Yes.

10           Q.    And when did Nora Harms tell you this?

11           A.    She told me this throughout, I think the

12       last year she was there, to the best of my

13       recollection, and she has told me a couple times

14       throughout that year.  And my work load, I got it

15       down, I got it under control, and she told me, I

16       was like, what are you talking about?  I got my

17       work done.  My stuff is done.  I'm staying extra

18       getting this stuff done, and that's what she told

19       me.  She would tell me a few times throughout that

20       year, better be careful.

21           Q.    Did Nora Harms ever tell you that

22       supervisors were watching you because you were

23       black?

24           A.    No, she didn't.

40

1       Q.    Did she tell you that they were watching

2    you because of your work or anything else?

3       A.    No, she didn't.  She just said they

4    watching you.

5       Q.    So you assumed they were watching you

6    because you were black?

7       A.    At that moment I felt it was

8    discrimination at that moment.  I'm like, what are

9    they watching me for?  I'm doing my job.  I'm

10    doing it thoroughly.  I'm taking on extra loads at

11    this office while other people are not taking on

12    the extra loads of the office.  They are getting

13    away with murder, who were not doing their job.

14    So yes, this is what I felt.

15       Q.    Okay.  When people were taken out of

16    rotation did you have to take over their cases?

17       A.    Some people, you had to help out with

18    their cases.  Some people if they couldn't get

19    them all done, you would have to help out, they

20    reassign stuff, yeah, they would reassign some

21    certain stuff.

22       Q.    Okay.  Do you know in the year 2000, and

23    I'm speaking of your team members on your specific

24    team, the names we have just listed, do you know



41

1    if they had more or less cases than what you were

2    assigned?

3        A.    I feel that I had more cases.  I was

4    BH.  BH, when I say BH that's the decree that you

5    only supposed to get 12 cases a month, but that's

6    a joke.

7        Q.    Do you know what BH stands for?

8        A.    BH stands for basically what it stands

9    for is to keep the case load down.  I mean, you

10   get 12 reports within the month, and you shouldn't

11   get over 12.  But, that never was, how would I say

12   it?  That never was a thing that where they paid

13   any attention to it.  They would go over BH all

14   the time because the work shortage, people come in

15   and out.

16       Q.    So during the period of 2000 what do you

17   base your opinion on that you had more cases than

18   your team members?

19       A.    I mean, I was there most of the time.  I

20   mean, getting cases.  And they always would give

21   me more than my fair share of being there.

22       Q.    Did you ever see a document or did

23   someone tell you or your team members that you had

24   more cases than let's just say Dave Harmon?

42

1          A.    Jamie Ralph even would read like who was

2     over BH.  And all the year on seven months out of

3     the year I was over BH.

4          Q.    Do you know if your other team members

5     were over BH?

6          A.    One or two of them was over BH, but not

7     all of them.  Some other people wasn't over BH.

8          Q.    Okay.  Do you know who was over BH

9     during the year 2000?

10         A.    I can't recollect that.  I know what he

11    said to me.  I can't recollect who was over BH

12    from that period of time.

13         Q.    So, apparently Jamie Ralph, who was Nora

14    Harms supervisor, told you that some people were

15    over BH during the year 2000?

16         A.    Yes.

17         Q.    Okay.  Do you know when he told you

18    this?

19         A.    No, I can't recall from that period of

20    time.

21         Q.    Okay.

22         A.    Because people were complaining about

23    high case loads and people were complaining about

24    they need more workers.  And he was reading who

43

1     was and who was not.

2          Q.    Okay.  So, obviously there was an

3     opinion that there was a lot of work in the Urbana

4     field office?

5          A.    Yes.

6          Q.    Okay.  So you were not the only person

7     who felt that you had a high case load at that

8     time?

9          A.    No.

10         Q.    Okay.  Do you know if other white

11    workers felt like they had a high case load or

12    were stressed out by the case load also?



13         A.    I mean, I can't recollect at the time

14    who was complaining.  I really can't recall back

15    to that point.

16         Q.    Okay.  In 2001 were these same people

17    members of your team, being Stacy McAdams, Carol

18    Hargest, Heather Forest, and Dave Harmon?

19         A.    Yeah.

20         Q.    And Steve Bryson?

21         A.    Steve, I think Steve just left.

22         Q.    Steve left in 2001?

23         A.    I think he just left because he got

24    tired of overload of work.  He couldn't keep up

44

1    with it.  And then he just left.  They never

2    disciplined him, but he just left.  He got tired

3    of not being able to help the team and they

4    allowed him to leave.  He just left basically.

5    And they came in for a brief period of time.

6        Q.    So, in 2001 do you know much your team

7    members, whether you had more, a higher case load,

8    higher BH, than any of your team members in 2001?

9        A.    Yes, I did.

10        Q.    Okay.

11        A.    Have a higher case load to the best of

12    my recollection.

13        Q.    Okay.  And what do you base your opinion

14    on?

15        A.    I base my opinion on because I mean many

16    a times, like I said, we have four members on my

17    team.  They would have me on more than three or

18    four occasions I would be only one on rotation on

19    my team.  That means from four, we handle two

20    counties, Champaign County and we handle Ford

21    County.  It's you go all the way to the Kankakee

22    border.  They would give me like, I would be like

23    I'm working on call this overtime where police can

24    call you, Nora had me running from Ford County to



45

```
 1    Champaign County to initiate cases.  I didn't get
 2    all the cases, but I got my fair share.  And these
 3    other people were off of work.
 4           I was ripping and running.  That was
 5    unfair to me.  They never left nobody else in
 6    rotation by themselves handling the whole team's
 7    business, only me they did that to.  They always
 8    had two other people there, but me they would do
 9    that to.
10    Q.    This was in 2001?
11    A.    Yes, that's probably 2001, it probably
12    was in 2000 too when Nora took over.  Yeah, it was
13    a couple times it would be just me and her.
14    Q.    Okay.
15    A.    And I would go out and do what I needed
16    to do ripping and running.
17    Q.    Did you ever tell Nora that you felt
18    that you were handling the entire team's work
19    because you were black?
20    A.    No, I didn't tell her that.
21    Q.    Okay.  So, just to clarify, was Dave
22    Harmon a part of your team in 2001?
23    A.    No, he wasn't, I don't think.  He was
24    there for like four or five, six months, until he
```

46

1    got a promotion.  Because he came from follow-up.

2    He was there a brief period of time.

3        Q.    So we've talked about the high case load

4    and being out of rotation.  Is there anything else

5    that you felt that your work was being scrutinized

6    because you were black?

7        A.    Say anything else?  I mean, I can't

8    bring some stuff in, you just talking about this

9    incident right here, right?  Are you talking about

10   the whole two year period?  I'm talking about when

11   I felt I've been discriminated against.



12       Q.    Okay.  Well, tell me when you felt that

13   you're first being discriminated against.

14       A.    I mean, from the point when Dawn

15   Bachtold accused me of misrepresenting notes, I

16   felt I was being strongly discriminated against.

17   From the second point when Maria Miller gave me

18   ten days off without even hearing my side of the

19   story, didn't believe me, told me I was lying and

20   yelling at me, stop lying.  And I broke down and

21   cried.  I was like, I dedicated myself to this

22   field.  I felt I was being discriminated against.

23   I would not tolerate that.

24       Q.    And that was back in February, or was

47

1    that back in 2000?

2        A.    That was further back.  Back in 2000,

3    you're right.

4        Q.    Okay.

5        A.    And then --

6        Q.    You grieved that discipline, did you

7    not?

8        A.  . Yes, I did.

9        Q.    Okay.  Back in 2000?

10       A.    Yeah, went to arbitration.

11       Q.    And you actually won that?

12       A.    Yeah, uncontested.



13       Q.    And they originally had given you a ten

14   day suspension?

15       A.    That's correct.

16       Q.    And as a result of the arbitration, the

17   ten day suspension was overturned?

18       A.    That's correct.

19       Q.    Okay.  And again, that was back in 2000?

20       A.    Correct.

21       Q.    Okay.

22       A.    Then another situation too, I felt I had

23   been discriminated when Nora was there.   Pat

24   McFall, the secretary, I had a death in my family,

48



1          my nephew.  He met an untimely death.  And

2          basically I was gone for like I'd say maybe a week

3          or a couple days after that, it was pretty tough

4          to me, my nephew like that.  She tells me Jamie

5          Ralph counted the days I'm gone to my nephew's

6          funeral.  You know, Pat McFall is telling me this.

7          You don't count the days I'm gone.  My work is

8          caught up.  I'm at a death.  He counted my days.

9          That's discrimination, why you hounding me, you

10         trying to find stuff to get against me.  And also

11         Pat McFall told me that also Nora throughout the

12         tenure of those two years they watching me when I

13         had my cases down, she would let me know too.

14              Q.    What is the race of Pat McFall?

15              A.    She is a white female.

16              Q.    White female and where does she work?

17              A.    She works at our Urbana field office.

18         She is still currently there.

19              Q.    She is a secretary to whom?

20              A.    She is secretary for both DCP teams now.

21         At times she was Nora Harms's secretary, and

22         Debbie Tullis's secretary at the time.

23              Q.    Okay.  And do you recall when path Mack

24         fall would have told you that Jamie Ralph was

49

1    watching you?

2        A.    My nephew died on March 12th, I think it

3    was even, I think it was 2001.  Something like

4    that.  March 12th, 2001.  I went to his funeral.

5    So, after I came back, so it had to be between

6    maybe the 14th or the 15th of March, 2001.

7    Somewhere in that week.

8        Q.    Okay.

9        A.    Where he was counting the days that I

10   was gone to my nephew's funeral.  I found that

11   quite appalling.

12       Q.    Okay.  Do you know of any other white

13   co-worker that had left for a death in the family

14   and they had not counted their days that they were

15   gone?

16       A.    No, I don't have no recollection of

17   that.  I don't have that type of information.

18       Q.    Okay.  Do you know if any co-worker, if

19   whether the supervisors count days team are gone

20   when they are sick or when they have a leave of

21   absence?

22       A.    I had a co-worker named Jack Cochran

23   where, may he rest in peace, he was a good guy, he

24   died on DCFS.  He would be gone constantly, Chad

50

1      Cochran.  They didn't count the days he was gone.

2      I mean, they would extend things and make sure

3      everything was great for him when he came back.

4            Q.    Do you recall when Jack Cochran --

5            A.    Chad Cochran, he worked, he was there

6      when I first came to DCFS, he came about a year

7      later but he was a case worker, then became an

8      investigator.  And he did work for Becky Jones

9      while she was supervisor for follow-up before she

10     became a manager.

11           Q.    And what was the race of Jack Cochran?

12           A.    He was a white male.



13           Q.    And when did he die, do you know?

14           A.    You know what?  I can't recollect when

15     he died.  But I know it was between '98 when Nora

16     first started and 2000.  He died in a car accident

17     in Ford County on an intersection, but Chad would

18     miss constantly two weeks here, two weeks there,

19     and nothing was done.  It was fine and dandy.  You

20     know.  Constantly.  It was open policy.

21           Q.    Did you ever receive any discipline of

22     any kind for being absent to attend your nephew's

23     funeral?

24           A.    No, I didn't.

51

1          Q.    Okay.  Did you ever have discussion with
2    Jamie Ralph or any of your supervisors regarding
3    their watching you or counting the days that you
4    were gone?

5          A.    No, I didn't.

6          Q.    Okay.

7          A.    And another situation too, I felt I was
8    being discriminated against, Nora was gone one
9    day.  And Becky Jones's secretary, she instructed
10   me to put cases in her office for confidentiality
11   reasons.  Just went through that COA thing with
12   the federal government with confidentiality.  And
13   basically I was putting the completed
14   investigation inside Nora's office and closing the
15   door, and Glenda, Glenda Ready, she is Becky
16   Jones's direct secretary at the time, she is like
17   what are you doing in there?  Then she said I·
18   don't want you to get in trouble.  She told me
19   that statement.  I'm saying, hold up.  What is she
20   telling me she don't want me to get in trouble?
21   I'm telling what Nora told me to do.  At that
22   point I am thinking Becky got her watching me for
23   her to make this type of a statement.

24         Q.    When did this statement happen?

52

1        A.      This statement happened between like I
2    told you when Nora was working there in '98, until
3    2001.   In those areas right there.  So, it was
4    before Nora left.  I can't give you a specific
5    date and time when it happened, but it happened.
6        Q.      Okay.  So, Glenda Ready asked you what
7    you were doing?
8        A.      Inside Nora's office.
9        Q.      Inside Nora's office?
10       A.      Right.
11       Q.      And that led you to believe that
12   management was watching you?
13       A.      Yes.  That led me to believe for her to
14   make that statement, and when I get instructions
15   from my supervisor Nora Harms telling me to put
16   this inside the office, to make sure
17   confidentiality is not breached, then she was
18   making that statement, she has got to be watching
19   me.  She got to be Becky Jones eyes and ears.
20   That is what it led me to believe.
21       Q.      Do you know if Glenda Ready knew that
22   Nora Harms allowed you to be in her office during
23   that period of time?
24       A.      I mean, no, I can't recall.  But I was

53

1    doing what Nora instructed me to do.

2        Q.    Was Nora in the office or around the

3    office?

4        A.    Nora was out of the office.  She was on

5    vacation.  Or she was in a conference.

6        Q.    Okay.  Did you ask Glenda Ready at the

7    time whether she knew if management was watching

8    you?

9        A.    No, I did not.

10       Q.    Do you have any other instances or

11   specifics as to your claim that management was



12   watching you?

13       A.    No, I have nothing else.  I want to add

14   one more other thing about another one of my

15   co-workers.  He was a white male.  Mike Fett.  He

16   solicited a prostitute, I think '95, '96 in

17   Champaign.  Nothing was done to him.  I mean,

18   Debbie Tullis talked to him, but he wasn't

19   disciplined.  He quit a year later.

20       Q.    What was the race of Mike Fett?

21       A.    White male.

22       Q.    When did this occurrence happen?

23       A.    Between '95 and I'd say '96.

24       Q.    Okay.

54

1        A.    I mean, to me that's dismissal.  Right

2    away automatically.  I mean, it was a client out

3    there too he was soliciting.  That was

4    unbelieveable.

5        Q.    Do you know who this supervisor was of

6    Mike at the time?

7        A.    Debbie Tullis was.

8        Q.    Debbie Tullis.  Okay.  Okay.  Is there

9    anything else that you can think of that, other

10   than what we've previously talked about, of why

11   you think that your work was being scrutinized

12   more than that of white co-workers?

13       A.    I think that's it.

14       Q.    Okay.

15       A.    At this point.

16       Q.    Is there anything that you would like to

17   look at, that you think that would refresh your

18   recollection?

19       A.    Not right now.

20       Q.    Okay.

21             (Whereupon, Deposition Exhibit No. 4 was

22   marked for identification.)

23       Q.    Mr. Johnson, I'm going to hand you

24   Exhibit 4.  I bet you recognize that.

55

1       A.    Yes.

2       Q.    Okay.  And do you recognize that to be

3       your answers to interrogatories?

4       A.    Yes.

5       Q.    Okay.  I'd like you to turn to page two,

6       if you would.  Okay.  We asked you a question

7       where we wanted you to state with particularity,

8       we wanted you to discuss with us what instances

9       you believed that you were being discriminated on

10      because that you were black.  And you listed a

11      number of things here, and I think we have

12      discussed some of these, and let me know if we

13      have discussed some of these, but I would like to

14      go through and narrow these down to dates.

15      A.    Okay.  I'm listening to you.

16      Q.    Okay.  So, "A" refers to scrutiny of

17      closed investigation file and accusation of

18      falsifying case notes.  Is this the incident that

19      we previously talked about where Dawn Bachtold

20      accused you of falsifying notes?

21      A.    Correct.

22      Q.    And then you received a ten day

23      suspension that was overturned?

24      A.    Yes.

56

1        Q.    Okay.  And this happened in

2    approximately April of 2000?

3        A.    Yes, to the best of my recollection.

4        Q.    Okay.  And "B" refers to a high number

5    of case assignments.  Have we discussed the higher

6    number of case assignments?

7        A.    Correct.

8        Q.    Is there anything else that you read

9    here that refreshes your recollection that you

10   would like to add to our previous discussion?

11       A.    No.

12       Q.    Okay.  "C" refers to extensions given to

13   white employees but not to you.  Now, here you

14   list a specific example of a white co-worker, Jan

15   Warwick.  Now, was Jan Warwick on your team during

16   that period of time?

17       A.    No, she was not.

18       Q.    Okay.  And when is this period of time

19   that you discuss here when she was given

20   extensions for overdo reports?

21       A.    That time was between like I said, when

22   Nora Harms started in like '98, to probably 2001,

23   right before she left.

24       Q.    Okay.

57

1          A.      That would be to the best of my

2     recollection.  I couldn't give you specifics.  But

3     she was constantly out of rotation because she had

4     high loads, when I say out of rotation I mean her

5     team just doesn't pick up.  Other workers got to

6     pick up extra loads of work.  And that's including

7     me and other workers.

8          Q.      Okay.  And so Jan Warwick was not on

9     your team, so did she have the same supervisor

10     during that period of time?

11          A.      No, she had Debbie Tullis and I had Nora

12     at the time.

13          Q.      Okay.  And "D" refers to white workers

14     taken out of rotation when they had high case

15     loads while you were not.

16          A.      Right.

17          Q.      And now I don't see any specific people

18     named here.  Did we discuss all those people that

19     you recall in our previous conversation, or is

20     there anyone else?

21          A.      Correct.

22          Q.      So we've discussed all of those

23     individuals that you recall that were taken out of

24     rotation while you were not?

58

1        A.    Right.

2        Q.    Okay.  And again, is this during the

3   same time frames that we spoke of earlier?

4        A.    Correct.

5        Q.    Okay.  And that's-- let's see.  I will

6   withdraw that question.  I will just go on to "E"

7   here.  Okay.  And "E" refers to your disparate

8   disciplinary action for breach of confidentiality.

9        A.    Right.

10       Q.    Okay.  Is that you state that it is.

11   Now, is this the --



12       A.    Sandy Gauze.

13       Q.    Sandy Gauze case.  And this is the

14   discipline that you refer to in your EEOC charge

15   that you received?

16       A.    That's correct.

17       Q.    Okay. And "F" refers to Lynda Morgan

18   losing five investigative files.  I believe we

19   discussed that also.  Is there anything else that

20   you would like to --

21       A.    No, that's correct.

22       Q.    Okay.  Under "G", you allege that

23   supervisors created and fostered hostile

24   atmospheres for yourself and other black

59

1        employees.  And under one you discuss a Maria

2        Miller.

3            A.    Yes.

4            Q.    Who was a child protection manager.

5            A.    Correct.

6            Q.    Now, a child protection manager is

7        actually above a child protective investigator, is

8        that correct?

9            A.    Child protection manager is above the

10       child protection supervisor.  Then you get the

11       investigators.



12           Q.    Okay.  So, in the chain of command, and

13       I'm going to back up just a little bit because I

14       believe at sometime there was a title change.

15           A.    Right.  You're correct.

16           Q.    And so a child protection investigator

17       is now referred to as a child protection

18       specialist, is that correct?

19           A.    They go, yeah, child protection

20       specialist.  That's what they do, the title

21       changed with federal money, that's what they doing

22       it, right, you're correct.

23           Q.    So, a child protection manager actually

24       would be a supervisor over the child protection

60

1        specialist or investigators?

2            A.     Right.  Child protection manager

3        supervises the manager and also the

4        investigations.

5            Q.     Okay.

6            A.     Right.  They can tell the supervisor

7        anything they want done.  And also the workers.

8            Q.     Okay.  So, number one, G1, describes

9        Maria Miller suspending you.  Is that the time

10       where you received the ten day suspension?

11           A.     Correct.

12           Q.     And it was overturned.

13           A.     Right.

14           Q.     Okay.  And that was in approximately

15       June of 2000.

16           A.     Yes.  To the best of my recollection.

17           Q.     Okay.  And two states that you attended

18       a child protection meeting to address staffing

19       issues at the Urbana field office.  And that you

20       state that Deb Kennedy, who was the regional

21       administrator, also attended the meeting, with

22       about eight or nine of your workers.

23           A.     Yes.

24           Q.     And you stated that Deb Kennedy said

61

1       Becky Jones is not a racist?

2           A.    Correct.

3           Q.    Then she laughed real loud?

4           A.    Yes, that's correct.

5           Q.    Do you recall when this meeting

6       occurred?

7           A.    I know it was between when Nora Harms

8       was there, and I think it was 2000 sometime.  To

9       the best of my recollection.  I couldn't give you

10      a specific date.

11          Q.    Okay.  Do you remember if it was before

12      you filed your EEOC charge?

13          A.    Yes, it was.

14          Q.    So, to your best recollection it was in

15      the year 2000 sometime?

16          A.    Yes.  I would even say 2000, right, to

17      the best of my recollection I want to say 2000,

18      even late, may have been, I think it was warm at

19      the time.  Maybe somewhere April.  I don't want to

20      throw you off, but the best of my recollection

21      early 2000 or between March and maybe June.  It

22      was warm at the time.

23          Q.    Okay.  And if at any time you need a

24      break, just let me know.

62

1          A.    No, I'm fine.  I can go straight

2     through.

3          Q.    Well, you don't know how long I'm going

4     to keep you here.

5          A.    That's fine.  I'm hyper.  I can go

6     straight through.

7          Q.    Okay.  You said that approximately eight

8     or nine other workers were there during this

9     meeting; do you recall who was at the meeting?

10         A.    I think Marsha Carter was there, Carol

11    Davis Hargest, Steve Sizemore, Jan Warwick was

12    there.  Deb Kennedy was there of course.  Becky

13    Jones attended the meeting.  I can't remember what

14    other -- I think Nora was there too.

15         Q.    Okay.  And again, Deb Kennedy's race is

16    black, is that correct?

17         A.    That's correct.

18         Q.    Okay.

19         A.    And Stacy McAdams, she was there, and

20    Steve Bryson, yeah, he was there too.  And I can't

21    recall the other people there, but it was, I think

22    Marilyn Walker, she was there.  That's the best of

23    my recollection who was there.

24         Q.    Okay.  When Deb Kennedy made the

63

1       statement Becky Jones is not a racist, was she

2       making that statement to you directly?

3               A.      No, she was making the statement because

4       we have workers also, I forget this lady's name,

5       she was there, because she asked her a question,

6       people were like black workers was making

7       reference to that Becky was unfairly treated.   And

8       Deb Kennedy, I don't know the exact statement or

9       question, that made a reference that Becky was

10      unfairly treating them because they were black.

11              Then Deb Kennedy came out and the



12      statement, Becky is not a racist, just out of no

13      where, and then started laughing out loud.   I

14      looked at her like man, this is unbelieveable.   I

15      can't believe she just said that and think it's

16      funny.

17              But one of my co-workers, I think it was

18      a case worker, I forget her name, God, I got it

19      into my head, Lois Drake, I think she made a

20      statement to her, to the effect, I think Lois

21      might have, to the best of my recollection, might

22      not be fully -- they made a statement, then all of

23      a sudden she came on and said she's not a racist.

24      Becky, a lot of blacks felt that Becky Jones was a

64

1    racist.  I'm bluntly telling you that.

2         Q.    Did you feel that Becky Jones was a

3    racist?

4         A.    Yes, I do. I feel she's still a racist

5    today.

6         Q.    Okay. And tell me why you think Becky

7    Jones is a racist?

8         A.    I think she is a racist -- I can give

9    you three reasons right now. Erica Collins, she is

10   one of my co-workers.  She fired her.  And then it

11   went to like a settlement.  Dory Gomez, one of my

12   co-workers, black female.  She got fired.  Then

13   recently Marilyn Walker, black co-worker, she

14   called me, they fired her.  I said you need to

15   take action.  Another black co-worker.  Then we

16   had one white co-worker they fired, Dawn Bachtold,

17   met up with Becky, he stood up for the black

18   workers, he got fired.  The funny thing about was

19   Erica Collins, to take it back, I think it was

20   probably 96-97 with her, she said Rufus, wait

21   until they come after you and you will see.  And

22   she was right.  They came after me.

23        Q.    Okay.  So, Erica Collins told you that

24   management would come after you because you're

65

1      black?

2            A.    Basically.  Yes, she did tell me that.

3            Q.    And Erica Collins had filed a racial

4      discrimination complaint also; is that correct?

5            A.    I think so.  I don't know the details of

6      her stuff.  I can't tell you blunt statements or

7      correct actual facts.  I know she filed something,

8      but she never disclosed, but she told me they will

9      be coming after me one day, and she was right.

10           Q.    Do you know the time periods where Erica

11     Collins filed her complaint?

12           A.    I would say between '96, maybe '95 to

13     '96, '97, somewhere in there.  That's the best of

14     my recollection.

15           Q.    And the other black co-workers that you

16     said were fired, do you recall the dates that they

17     were fired?

18           A.    Recent; I can't tell you.  Marilyn

19     Walker was just recently terminated.  She called

20     me about, I was working overtime, it was about

21     five or six o'clock or seven, I was in my office.

22     I would say she was recently fired this September,

23     I would say late August.  And I don't think it's

24     no coincidence that three black workers and then a

66

```
 1      white supporter who supported blacks got fired.  I
 2      mean, God, I mean it's unbelieveable.
 3          Q.    Okay.  Mr. Johnson, I would like you to
 4      state now why you think Becky Jones discriminates
 5      against you.  Or how she has discriminated in the
 6      past.  What specific actions has she said or done
 7      to you?
 8          A.    Basically Becky Jones is over Jamie
 9      Ralph.  She gives Jamie Ralph orders to do
10      specific things.  Before that breach of
11      confidentiality, Jamie Ralph basically told me
12      nothing is going to happen with this.  Before I
13      knew I had an investigation on me.  And then all
14      of a sudden after he interviewed and talked to
15      everybody saying I'm breaching confidentiality.
16      You know what he said?
17              I talked to my office, I don't leave
18      stuff outside of my office.  I talk in my office.
19      He told me I said it out loud.  And I breached
20      confidentiality.  Not Dawn Bachtold's workers, Pam
21      Wendy, got Lisa Sanders, not Sandra Skully who
22      spread it throughout the greater office.  To me
23      they violated breach.  But they put it in my file.
24      I had to do a grievance to force them to take it
```

67

1     out of my file.

2              To me he acts on behalf of Becky.  Becky

3     is still upset, her and Dawn and Maria Miller

4     because I done my grievance in the first instance.

5        Q.    Okay.

6        A.    The grievance where I was falsification.

7     And it's called retaliation.  That's what it's

8     called, plain and simple.

9        Q.    Okay.  So, do you know, how do you know,

10    is there a conversation, did anyone tell you?

11       A.    No, no conversation.  Becky Jones gives

12    the order to fire people.  She gives the order for

13    discipline.  She talks to Deb Kennedy, and Deb

14    Kennedy let's her do what she wants to do.

15       Q.    How do you know that that is how it

16    happens, that Becky Jones gives the orders for

17    disciplines and firing?

18       A.    She does.  She gives the orders.

19       Q.    How do you know that?

20       A.    She gives -- Jamie is her direct

21    supervisor.  She tells Jamie what to do.  And I

22    know where it came from.  I have no proof, but I

23    know it came from her.

24       Q.    Do you know if Jamie has any -- Jamie

68

1      Ralph, I guess we are talking about?

2           A.    Yeah, I'm talking about Jamie Ralph.

3           Q.    Do you know if Jamie Ralph has any

4      power--

5           A.    Jamie has no power.  He was a puffy for

6      Becky Jones, just bluntly.  He told me nothing was

7      going to happen with this.  I mean, I'm sorry, but

8      it comes to the point when you live this stuff, he

9      tells you nothing is going to happen, then I'm

10     getting all reprimanded for other workers passing

11     stuff throughout the greater office.  I'm inside

12     my office.  I violated nothing.  So, Jamie, it

13     came from -- it had to come from his supervisor,

14     Becky Jones.

15          Q.    Okay.

16          A.    I'm sorry, but it had to come from her.

17     I have no proof of it.  That is your question.

18     No, I have no proof.  But, that's where his orders

19     come from.

20          Q.    Okay.  Were you and Jamie Ralph friends?

21          A.    No, we were not.  I helped Jamie move

22     into his house, he needed help.  He was new.  And

23     me and another guy helped his supervisor.  I just

24     out of good nature just to help the guy move into

69

1    his house, and that was basically it.

2        Q.    Did you ever go to Jamie Ralph regarding

3    any of your allegations that you were being

4    treated differently, or your work was being

5    scrutinized more than white co-workers?

6        A.    No, I did not, because Jamie Ralph

7    represented Becky Jones.  And Becky Jones didn't

8    have my best interests in mind.  Nothing would

9    have got resolved out of that situation.

10       Q.    Okay.  So, did you ever go to Nora Harms

11   and tell her, your immediate supervisor, that your

12   work was being scrutinized more than white

13   co-workers?



14       A.    When Nora made those statements to me

15   throughout the year, saying they watching me, I

16   say, what is this about?  I'm like, I corrected

17   the action plan of whatever you all saying my case

18   is where I did this, where an evaluation.  I'm

19   like, it is not right.  This is not correct.  And

20   I was like hey, I told her this is discrimination

21   at a point when she was telling me that.  I just

22   looked at her.  When she brought it up to me I

23   told her what I felt it was discrimination.  They

24   was monitoring me.  They was watching me.  And she

70

1   would tell me that.  Me and Nora had a good

2   relationship.  She eventually left the office too.

3       Q.   Did you feel that Nora Harms was

4   discriminating you?

5       A.   No, I did not.  Nora Harms did not

6   discriminate against me.

7       Q.   And would Nora Harms actually be the

8   person who assigned you cases?

9       A.   Yes, but we had a rotation system where

10  it came up, cases came up.  Whoever was in

11  rotation.

12      Q.   So, whoever was in rotation within your

13  team?

14      A.   Within the whole nuclear of the team,

15  because we were down so many people they put it

16  straight rotation because we didn't have enough

17  people.

18      Q.   Okay.  And when cases are assigned,

19  aren't they also given a priority number, or I

20  guess a --

21      A.   Yeah, you know, priority one is sex

22  abuse, physical burns, death; priority two is lack

23  of supervision; priority three is dirty home.

24      Q.   Is it correct to say that a priority one

71

1    case would take more time than a priority two or

2    three case?

3        A.    Yeah, if the police, State's Attorney's,

4    it depends on what type of case it is, a death

5    case you got other people involved.  Yes, it takes

6    more time.

7        Q.    Do you know if you had other priority

8    one cases than other team members during 2000?

9        A.    I had a lot of-- I had a lot of sex

10   abuse because I was good at them.  Got a lot of

11   confessions.  I can't recall if I had more

12   priority one cases.  I really can't recall that

13   information.

14       Q.    Would the department assign a person who

15   has more priority one cases less cases as a whole,

16   than a person who would have let's just say more

17   priority two cases?

18       A.    That wasn't the practice of that office.

19   I think certain people they wouldn't give,

20   overload them.  But, other people they would.  So,

21   they broke a lot of rules of their office.  I

22   really, to the best of my recollection I didn't

23   have no proof that they would assign more priority

24   one cases.  I know I got a lot of them.

72

1     Q.   ·Okay.   You said that they broke a lot of
2     rules.   What rules did they break?

3     A.   I mean, basically when you overloading a
4     person with a lot of heavy case loads, I mean you
5     take time, give that person a chance to catch up
6     like you gave my white counterparts.   You don't
7     just keep like hey, if you don't get this done and
8     you didn't get this and that where other people
9     are getting time and the luxury of sitting out to
10    get their work load done, you give everybody, you
11    extend that hand to everyone.   You just don't
12    extend that hand just for a certain number of
13    people.   That's what I'm saying.

14        And they gave, we was over BH a lot,
15    over the count a lot.   Constantly over count of
16    BH of cases.   They could have brung people from
17    like we had a person like Terry Walters, he is
18    like a roving investigator, he would come to the
19    office, but they could have brung other people in
20    from other offices to help out and stuff to get
21    this under control.   They chose not to in a lot of
22    situations.

23    Q.   Do you know if other white co-workers
24    were also over BH?



73

1       A.    Yes, some of them were.  I can't
2   recollect who they were at this time because it
3   was a long time ago.
4       Q.    Okay.  So, let's go to number five.
5   Well, I believe number four we have already talked
6   about.
7       A.    Yeah, we talked about that.
8       Q.    Okay.  Is there anything else that you
9   would like to add to number five that we haven't
10  discussed such as other white employees who were
11  being treated better than you?
12      A.    No, I don't have another one to add to
13  that, no.
14      Q.    Okay.  Number six states that your
15  immediate supervisor, Nora Harms, told you on
16  several occasions that management was watching
17  you.  Now, can you tell me approximate dates when
18  Nora Harms would have told you that management was
19  watching you?
20      A.    Only thing I can tell you basically is
21  between '98 and the time when she got hired,
22  within a six, seven month period of when she got
23  hired, she told me on several occasions they
24  watching me.  And she told me be careful.  And I

74

1    told her, I said my work is, I corrected that

2    thing, got the cases down for being overloaded and

3    the stuff.  And I did the action plan.  Whatever.

4    And because basically Becky Jones was forcing her

5    to give me an evaluation that I didn't care for.

6          Q.    Okay.

7                 (Whereupon, Deposition Exhibit No. 5 was

8    marked for identification.)

9          A.    I can't give you specifics, but within

10   the time frame she was there.

11         Q.    You talk about, I think we have talked

12   about before you mentioned the corrective action

13   plan.  I'm going to hand you Exhibit 5, which

14   appears to be your performance evaluation for the

15   period of January 1st, 2000, to December 31, 2000.

16   Does that look like an accurate and correct copy

17   of your performance evaluation for that time

18   period?

19         A.    Yeah, this a copy.

20         Q.    If you would turn with me to page four,

21   I believe it's Bates stamped 23, okay, is that

22   your signature?

23         A.    Yes, that's my signature.

24         Q.    Okay.  And it's dated April 26th, 2001?

75

```
 1        A.   Yes.

 2        Q.   Okay.  And your supervisor's signature,

 3   that's Nora Harms?

 4        A.   Yes, that's correct.

 5        Q.   Okay.  And then the next higher level

 6   states it's Jamie Ralph during that time period.

 7        A.   Yes, that's correct.

 8        Q.   Becky Jones appeared to have also signed

 9   that?

10        A.   That's correct.

11        Q.   Then all the way up to the agency head's

12   signature?

13        A.   Yeah, that's correct.

14        Q.   Which would have been a Mr. McDonald.

15        A.   Okay.

16        Q.   So, if you would now turn to page two,

17   okay.  On page two it appears to be that certain

18   aspects of your job, the general appraisal of the

19   employee's performance, and there is a part to be

20   completed by the supervisor and there's also a

21   part to be completed by the employee; do you see

22   that part?

23        A.   Yes.

24        Q.   Okay.  And here out of the -- it looks
```