**E-FILED**
Tuesday, 28 September, 2004  04:45:09 PM
Clerk, U.S. District Court, ILCD

76



 1    like you were generally rated eight out of the ten

 2    qualities that are listed here, number one is job

 3    knowledge.  And as far as you know Nora Harms

 4    would have checked, would have been the supervisor

 5    who would have rated you.  And here for job

 6    knowledge it says that you meet expectations and

 7    apparently you agreed with that; you also have

 8    that you met expectations in that particular area,

 9    is that correct?

10         A.    Yeah.

11         Q.    Okay.  And for productivity it says that

12    the supervisor deemed that you needed improvement,

13    and apparently you thought that you needed

14    improvement in productivity during that time

15    period as well?

16         A.    Yes, because I mean I needed time to be

17    out of rotation to catch up on my work because

18    they were loading.

19         Q.    Okay.  So you felt that you weren't as

20    productive as you could have been during that?

21         A.    Because they was overloading me, yes.

22         Q.    Okay.

23         A.    That's why I agree with her.  I voiced

24    that to her.

1        Q.    Okay.  And quality that your supervisor,

2    Nora Harms, thought that you needed improvement,

3    but you thought that you met the expectation for

4    quality?

5        A.    Yes.

6        Q.    Okay.  And there looks to be three other

7    areas that Nora Harms thought that you needed

8    improvement on, which is use of time, planning and

9    follow up.  Is that correct?

10       A.    Yes.

11       Q.    Okay.  And it looks like the use of time

12   and follow-up you also agreed that you needed

13   improvement in those areas?

14       A.    Yes, like again, I said, follow-up is

15   when you deal with a lot of delicate situations,

16   they overload you a lot of work, you can't give

17   back to all the stuff you need to get to, piece of

18   you over here, piece of you over there, I thought

19   I needed improvement.  I needed time to get all

20   the stuff done, to be out of rotation; again, it

21   goes back to that.

22       Q.    If you turn back with me to page four,

23   there is an area above your signature that gives

24   you the chance or an employee to make comments to



78

1    their performance evaluation. Do you recall if

2    you decided to make any formal comments?

3        A.    No, I didn't make no formal comments

4    because blatantly Nora Harms is being forced by

5    Becky Jones to give me a negative evaluation when

6    I carried that office for a lot of periods of time

7    and was dedicated. So I didn't do nothing. I

8    said at that point I'm getting out of here. So I

9    didn't cut no waves, I was like hey, I don't have

10   time for this. No, I didn't make no formal

11   complaint. She had pressure on her to basically

12   to force her to give me a negative evaluation.

13       Q.    Okay. Why do you think that Becky Jones

14   forced Nora Harms to give you a negative

15   evaluation?

16       A.    It goes back to retaliation. It goes

17   back to the one where I won my grievance in the

18   first place, they was very upset with that thing.

19   They thought I was going to like cut a deal with

20   that. So, it goes back to the whole thing to that

21   pressure situation. Becky Jones did not care for

22   me. She wanted me out of that office. And I gave

23   her a wish. I left.

24       Q.    Okay. Now, do you know if Nora Harms

79

1     had any involvement in your ten day suspension

2     that happened in the year 2000?

3         A.    She was the supervisor.  She didn't get

4     the thing going, the suspension going.  She had to

5     go along with the rank and file to keep her job.

6     She was in a difficult situation.  So she had to

7     go, like I said, she had to go along with

8     management.  She was part of it.  She had to go

9     along with it.  She didn't get this thing going,

10    but she was caught in the middle of it.

11        Q.    Okay.  Do you have anything else someone

12    told you, statements, comments, that Becky Jones

13    made Nora Harms give you a negative job

14    evaluation?

15        A.    No, I don't have those comments, but I

16    know where it came from.  From Jamie, Becky put

17    the pressure on Jamie Ralph, and Jamie Ralph put

18    the pressure on Nora.

19        Q.    Okay.  If you would turn with me to

20    Bates stamp 24 of this performance job evaluation.

21    And this is regarding the appraisal of objectives.

22    And apparently there are certain objectives that

23    protective investigation, I'm sorry, I lost the

24    title, what was the title?

80

1          A.    These are appraisal objectives like you

2     said, basically a child protection investigator,

3     child protection specialist, you can say

4     investigator.  That's appropriate.

5          Q.    So investigators were, and correct me if

6     I'm wrong, but all investigators were expected to

7     meet certain objectives?

8          A.    Correct.

9          Q.    Okay.  And here attached to your job

10    evaluation during this time period it's indicated

11    whether you had met certain objectives and whether

12    you had not met certain objectives.  And the first

13    one, well, we will just go through the ones marked

14    not met.  It says that you were to complete 60

15    percent of investigations within ten working days.

16    And that says it wasn't met.  And then three also

17    says that complete 75 percent of investigations

18    within 30 working days.

19              And as a result of certain objectives

20    not being met, there was a corrective action plan.

21    And you have discussed that earlier, is that

22    right?

23         A.    That's true.

24         Q.    Is that the corrective action plan you



81

1      were talking about?

2           A.    Yeah.

3           Q.    Okay.  And did you have a time, an

4      opportunity to read the remarks made by your

5      supervisor that is attached Bates stamp 25?

6           A.    Yes, I read the remarks.

7           Q.    Okay.

8           A.    I mean, before, yes, before I signed it.

9           Q.    And was it your understanding that these

10     remarks, the attachment to, that those were

11     actually the remarks of your immediate supervisor,

12     Nora Harms?

13          A.    Yes, Nora Harms.

14          Q.    Okay.  And did you agree with the

15     statements in here, or the percentages or --

16          A.    No, I didn't agree with her.  I told her

17     it was coming from Jamie to Becky, and I told her

18     I'm not going to make waves, I will eventually get

19     out of here.  So, basically I'm going to sign it,

20     go home so I can get my raise, then go home about

21     my business.

22          Q.    So, sometime approximately when you

23     signed this about April 26th, 2001, you told her

24     that you were going to get out of the office?

82

1      A.    Basically.  She left before I did.

2      Q.    Okay.  But, so you are telling me that

3  sometime in April of 2001 you were planning on

4  leaving the office?

5      A.    Yeah, I was thinking about it.  I've

6  been thinking about leaving the office for the

7  past when I first got there, from the past when I

8  first started.  I was planning to get out of there

9  eight years ago if my mother didn't get sick.  I

10  have been planning to leave that office for a

11  while.



12      Q.    The Urbana field office?

13      A.    Yeah, when I first came, when I was two

14  years into it I was planning to go.  So this is

15  nothing new.  People always were joking about you

16  still here, you know.

17      Q.    And were you planning on leaving because

18  of any particular circumstance?

19      A.    This circumstance when I told Nora about

20  this, I was planning on leaving because of

21  circumstances I felt like I was being

22  discriminated against.  And this point the other

23  time I was planning on leaving to move up with my

24  girlfriend in Chicago.  And I was planning on

83

1    doing that.   That was the other circumstance.

2         Q.    At that time where did your girlfriend

3    live in Chicago?  Was it Chicago or was it --

4         A.    Stoney Island.   She lived on 95th and

5    Stoney Island at the time.   That is eight years

6    ago.   That's about seven, eight years ago when I

7    first planned to move.

8         Q.    How far is that away from Aurora?

9         A.    From Aurora, you talking about maybe 30

10   miles, 35 miles.

11        Q.    Okay.   Is this the girlfriend that has

12   your child?

13        A.    No, I'm not currently seeing her, no,

14   she is not the girlfriend.

15        Q.    Okay.   So, apparently you did not leave

16   after you received this job performance

17   evaluation.   You stayed for approximately another

18   year?

19        A.    Right.   It takes time to -- you got to

20   put your names on lists to get up north until

21   openings come up.

22        Q.    And do you recall when you agreed to a

23   geographical transfer?

24        A.    I say between this and until the time I

84

1      left.

2          Q.    Okay.

3          A.    I had an opportunity to go before, and I

4      didn't go to Aurora before because my mom was

5      getting real, real critical and I stayed so I

6      don't have to keep making a long drive, because

7      she was in St. Louis, so I didn't leave because of

8      that. And I wanted to, but I didn't.

9          Q.    So you stayed, your residence was in

10     Bloomington?

11         A.    Yes.

12         Q.    And your mother was in St. Louis?

13         A.    Yes, St. Louis, Missouri, yes.

14         Q.    And at the time that you actually took

15     your geographical transfer to Aurora was your

16     mother still in St. Louis?

17         A.    Yes.

18         Q.    Is she still alive to this day?

19         A.    No, she is not.

20         Q.    When did she pass away?

21         A.    She passed away about a year and a half

22     ago, I think a year and a half, two years ago.

23         Q.    So, after you had --

24         A.    Yeah, I was driving 300 miles going to a

85

1     nursing home, yes.

2         Q.    Okay.  Again, do you recall the date

3     when you requested your geographical transfer?

4         A.    It was basically, it was, I requested it

5     in December.  December I think 2001.  And went up

6     there January, about 10th or 12th.  Because I

7     remember the day because Jamie Ralph was begging

8     me to stay there, we can work something out.  That.

9     is why I recall the date.  And basically I got

10    hired real quick and I left, they told me February

11    11th was my leaving day.  And I mean, when I would

12    be out of rotation because they was trying to give

13    me cases away on February 11th.

14        Q.    2002?

15        A.    Yes, and I left, my official last date

16    there was March, I think March 1st, the first date

17    March 4th was my first date in Aurora.  March 4th,

18    2002.

19        Q.    Okay.  Mr. Johnson, did you ever request

20    a geographical transfer to another DCFS office

21    other than Aurora?

22        A.    No.

23        Q.    Okay.  Why Aurora?

24        A.    They had a lot of openings in Aurora.

86

1    They had openings, had space where I went to

2    Aurora.

3        Q.    Do you know if they had any opening in

4    any other field offices?

5        A.    Yes, it was tough, I wanted to get in

6    Glen Ellyn, it's an upper scale area, but a lot of

7    workers don't leave.  They stay there.

8        Q.    Did you request a transfer to Glen

9    Ellyn?

10       A.    Yeah, I tried to get in there but I

11   never could, so I just took Aurora.



12       Q.    Did you request a geographical transfer

13   to somewhere in Southern Illinois that would have

14   been closer to St. Louis?

15       A.    No, I did not.

16       Q.    Okay.

17       A.    It was -- they had openings, I knew they

18   had, and the supervisor wanted me to come and I

19   talked to her, boom.

20       Q.    Did you just happen to like the Aurora

21   living better than Southern Illinois?

22       A.    No, I didn't.  I didn't like it better,

23   but it was a quicker option to get out of there

24   for me.

87

1          Q.    So you are telling me you requested a

2     geographical transfer to some other field office

3     other than Aurora?

4          A.    I requested, I wanted to get to Glen

5     Ellyn.  When I couldn't get to Glen Ellyn, my

6     first choice, I took my second choice of Aurora.

7          Q.    So Glen Ellyn was your first choice, and

8     Aurora was your second; did you have any other

9     choices?

10          A.    No, I did not because I knew Aurora had

11     openings, I could get in Aurora to get out of that

12     office.  That's why I did it.

13          Q.    Did you know anyone up in the Aurora

14     office?

15          A.    No, I knew no one.

16          Q.    You didn't have a friend up there?

17          A.    Not in the Aurora office, no.

18          Q.    Did you have a friend up in Aurora

19     perhaps that you wanted to move closer to?

20          A.    No, I did not.

21          Q.    So you just picked Aurora because it

22     seemed like a nice place to live?

23          A.    It was a place to go to get out of

24     Champaign-Urbana, being honest with you because I

88

1    had--

2         Q.    Did you ever do any research to see if

3    any other place other than your field office?

4         A.    It was Glen Ellyn, like I said, about 20

5    miles away, one of the nicer areas.

6         Q.    So, no other places than Glen Ellyn or

7    Aurora did you see if they had immediate openings?

8         A.    Right, that's correct.

9         Q.    Okay.  In paragraph number 12, I don't

10   think we have discussed this yet.  You state, and

11   I'm referring to your interrogatories, I'm sorry.

12   I want it to be clear for the record too.

13   Paragraph 12 of your interrogatories you state

14   that Becky Jones and Dawn Bachtold are racist.

15   And that Becky and Dawn tried for two years to set

16   you up to fire you.

17        A.    Right.

18        Q.    Now I want to know anything and

19   everything, the reasons why you think that Becky

20   Jones and Dawn Bachtold was setting you up to fire

21   you?

22        A.    First of all, Becky Jones hired Dawn

23   Bachtold.  She was one of her workers when Becky

24   Jones was supervisor.  One of her cronies, I would

89

1    say.  I mean, the moment Dawn Bachtold accused me,

2    I mean Dawn Bachtold could do no wrong in Becky

3    Jones's eyes.  Anything, favoritism, anything.

4    She was the fair haired girl in that office.  Dawn

5    Bachtold was in Becky Jones eyes.  Like I told you

6    one, we discussed when she accused me of we had

7    the conversation of falsification.

8              Then two weeks later I mean I raised up

9    and down simultaneous, I do all the time, that's

10   why I do investigations to get stuff to the court,

11   I always make sure I write stuff down right there



12   in that moment.  She accused me of this, you know,

13   of falsifying something, I'm saying to myself this

14   is ludicrous.  She was trying to get me fired.

15   Disciplined. And from that point on Becky Jones,

16   she answered to Becky Jones.  She goes to her for

17   direction.  She is her mentor.  She is the person

18   that she goes to.  She didn't know what she was

19   doing in that job.

20             She was the supervisor, she was

21   horrible, to tell you the truth.  Her workers

22   complain about her all the time.  From the point

23   on Becky told her what to do.  She came before me,

24   and on her own ex-co workers, like what is she

1    tying to do to her, you know.  Because I had a

2    good relationship with most of the people in that

3    office.  I helped tons of people out in that

4    office.  When people was in distress, I helped a

5    lot of people out in that office.

6            And basically Maria Miller, they all

7    took the side they didn't want to listen to me in

8    that situation.  They don't want to hear the total

9    details.  Dawn had to tell them because she was a

10   Caucasian female against a minority that he's not

11   telling the truth in this situation.  They would

12   not even hear my side of the story until we got to

13   arbitration when they lost uncontested.  I mean,

14   it's unheard of for an arbitration to be

15   uncontested like mine was.  Then she talking about

16   he didn't say nothing.

17           Yes, I did.  I tried to say something to

18   Maria Miller and she wouldn't listen to me and

19   Becky Jones is overseeing this whole thing.  She

20   was overseeing this whole situation.

21       Q.   Okay.  So you're talking about the

22   period of time in 2000 where you begin?

23       A.   Where it began.

24       Q.   The ten day suspension?

91

1       A.      Right.

2           Q.      You made a comment that Becky Jones was

3       considered fair haired?

4       A.      Yeah, I mean not Becky Jones, I mean --

5           Q.      What do you mean by that?

6       A.      I mean, Dawn Bachtold was fair haired.

7       Anything that would do, Becky was her -- Becky

8       hired Dawn Bachtold.  She really shouldn't, to me

9       that was against policy because she was on her

10      team.  I mean, how can you hire somebody to be

11      fair in the interview when you got favoritism for

12      that person.  When I say Dawn Bachtold was fair

13      haired, Becky Jones was Dawn Bachtold's mentor.

14      She went to her for advice.  She worked for her

15      and everything.  That is what I meant by that.

16      She could do no wrong.

17          Q.      What is what I wanted to know what you

18      meant.  I don't know what that terms means.

19      A.      I don't know, I'm sorry.

20          Q.      Maybe it's a term that you know.  I

21      don't know it.

22      A.      I mean, everybody knew that in the

23      office.  She could do no wrong.

24          Q.      So, when you refer to someone as fair

92

1    haired, is that --

2        A.    To Dawn Bachtold I refer to her as fair

3    haired.  That means that Becky Jones in her eyes

4    she got a lot of favoritism.  She believe anything

5    she said to her.  Anything.  She believed that she

6    was telling the truth over me.

7        Q.    Because she was white and you were

8    black?

9        A.    Yes.

10       Q.    Okay.

11       A.    That's the way I perceived it.

12       Q.    So, fair haired to you would describe

13   someone who was Caucasian, not black?

14       A.    No, I'm saying fair haired to me is, to

15   her, to the point is that Becky Jones is showing

16   her favoritism.  Anything that Dawn Bachtold would

17   want to pursue against the workers, she would be

18   210 percent supportive instead of evaluating the

19   situation and looking at all the alternatives, all

20   the pieces of the puzzle.  She just loose like a

21   renegade.  She just went with Dawn.  That is the

22   way Dawn is.  She snoots and she goes.  She don't

23   look at the total situation.  She goes.  And Becky

24   Jones supported that situation.  And she would

93

1       support her in any situation like that. That is
2       what I meant basically.

3               Q.      So when they were setting up to fire you
4       you are saying that this all stemmed from your ten
5       day suspension?

6               A.      Right.

7               Q.      Okay. And from that point in 2000 and
8       you said for the past two years, was there --

9               A.      The whole thing about it was they tried
10      to get this, they gave them a ten day suspension,
11      they kept putting stuff in my file from Nora Harms
12      telling me, from Pat, to Glenda, making those
13      statements about what you doing in the office,
14      Nora said watching yourself, to Pat telling me to
15      watch myself, counting the days I'm going to a
16      funeral. They were looking for little things in
17      my investigation. I was the actual investigator.
18      I put a lot of people in jail. I was tight on my
19      investigation.

20              What I mean by tight, they were narrow
21      and they were conclusive. Then also I was the
22      type of person I stood up for people who unfairly
23      got their kids taken away. Champaign County has
24      has horrible reputation of taking people's

1    children like a fast food or protective custody.
2    I think that's wrong. And basically I stood up
3    for some of those people. And I would tell them
4    hey, you need to go hire yourself an attorney and
5    get out of the situation. I didn't support a lot
6    of their ideas always about that. People should
7    not have their civil rights violated in these
8    instance. And they still have a horrible record
9    of it. And they didn't like this viewpoint. I
10   couldn't sleep at night not being fair to these
11   individuals, and they didn't agree with that.

12       Q.   Okay. You made a comment that they kept
13   on, and I'm guessing you are talking about
14   management putting stuff in your file. When you
15   say that are you talking about discipline, they
16   tried to make your file look--

17       A.   They tried to get, like I said, the ten
18   day suspension they didn't think I was going to
19   fight that. They was trying to get stuff on me.
20   I fought it. Then the can of stuff came up. Then
21   Sandra Gauze came up. They tried another attempt
22   to get me.

23       Q.   So we have the ten day suspension, then
24   we have the breach of confidentiality, which you

95

1       reference in your EEOC charge?

2           A.      Right, but I mean it was little

3       incidents of hey, that was minor to me.  They was

4       looking at any little thing to try to get me and I

5       knew that.

6           Q.      Okay.  Anything else other than the ten

7       day and the oral reprimand that was reduced to an

8       oral counseling, was there anything else that you

9       know that they tried to put in your file?

10          A.      No, just the monitoring of me from

11      people telling me what was going on, and I knew I

12      had to make sure that all my investigations.  I

13      mean, just like for example I had a kid that died

14      on a case.  Not me.  But, I had a kid, a death

15      case came in.  A kid drowned.  Heather Forest had

16      the case.  Jamie Ralph called me in and they

17      wanted to review my investigation.

18                  My investigation was tight.  When I mean

19      tight, it was thorough.  I tried to get the

20      State's Attorney to take this mother's kids

21      through a petition because we didn't have enough.

22      And comes to find out the State's Attorney didn't

23      react.  They was reviewing my file on the death

24      thing to see if I had any holes in it.  It didn't

96

1    have any holes in it.

2        Q.    When did that happen?

3        A.    That happened sometime when Nora Harms

4    was there, and Heather, I would say within that

5    last year or so.  So, before she left.  Jamie

6    Ralph was the manager, so I mean they was looking

7    for any little thing.  They couldn't find nothing.

8        Q.    Jamie Ralph became the protection

9    manager after --

10        A.    After Maria Miller.

11        Q.    Okay.

12        A.    Maria Miller, then Jamie Ralph.

13        Q.    And Jamie came in approximately around

14    March 2001, does that sound correct?

15        A.    I think so.

16        Q.    Okay.  So, it would have been prior to

17    March of 2001?  Well, do you know when Nora Harms

18    left?

19        A.    Nora left like six or seven months,

20    because we had like, we had another person like,

21    who was it?  John or something.  We had John

22    House, he was a good guy.  He was a manager before

23    he left.  So I would say between six, seven months

24    where they hired a new person, then that is right

97

1       before I left because Kevin Hauser came and he was

2       upstairs and I left because he didn't know what he

3       was doing.  And I wasn't going to train another

4       supervisor.  I helped Nora through it.

5            Q.   So the incident you just described about

6       I believe was it the child who had died?

7            A.   Yes.

8            Q.   And they investigated your file?

9            A.   They looked into my file.

10           Q.   They looked into your file.  And do you

11      know approximately when that happened?

12           A.   I would say between, before Nora left,

13      the time frame, I can't give you no good details

14      on the things.  But the State's Attorney didn't

15      act on the situation.

16           Q.   Do you think it was in the year 2000 or

17      2001?

18           A.   It might have been between 2000, 2001.

19      I can not give you all of the details.

20           Q.   Okay.

21           A.   Of the situation.  But, I mean, they

22      review files all the time like on death cases, but

23      they went through mine real thorough because Nora

24      was real nervous, did you get all this stuff.  I

98

1    was like, what are you doing, everything is

2    covered in there because I was like everything is

3    covered in this thing.  You had nothing to worry

4    about.

5        Q.    Okay.  So generally the office, or the

6    State's Attorney, reviews a case where a child has

7    died?

8        A.    No.  What happens is, any time a kid

9    died, they look at someone's previous cases, and I

10   knew in this situation this mother wasn't going to

11   protect this kid, but I didn't have enough to take

12   her kid.  And I would have liked to because she

13   needed her kid gone.  But, she had the perpetrator

14   out of the environment.  I told the State's

15   Attorney, I've been out there seven times, I said

16   you need to file a petition.  We need to get this

17   mother court ordered to do certain things or

18   somebody is going to get hurt.

19              And they never followed through with the

20   situation.  And they didn't know Nora was real

21   nervous, that led me to believe her real nervous

22   about this kid dying that any little screw up they

23   was going to get on her too as far as discipline.

24   That is what I was picking up.  She never told me

1    that, but she was too nervous about the situation.

2    I've never seen her that nervous.

3       Q.    So you thought that if -- I mean, Nora

4    being your immediate supervisor, that she would

5    have been responsible if your file wasn't in

6    order?

7       A.    Right.  Exactly.  But she was real

8    nervous, because she was getting pressure from the

9    top too before she left.

10      Q.    Okay.  So did you feel that your file

11   being looked at in the case where the child had

12   died, that that was based on your race?

13      A.    No, I think it was, I think they looked

14   at it and scrutinized it a little more thoroughly

15   than they would somebody else's file because of

16   these past incidents.  I really do.  Because Nora

17   was too nervous at the time, I mean she was real

18   panicky.  I never, I say why don't you calm down?

19   Everything is fine.  You just need to calm down.

20   But I never seen her that panicky.

21      Q.    Can you give me the name of a white

22   co-worker where their file wasn't as scrutinized

23   as much as you think that your file was

24   scrutinized in that case?

100

1          A.      I mean, can you repeat that again?

2          Q.      Can you give me the name of a white

3      co-worker, and I will even narrow it down to

4      between the year 2000 to the time you left, 2002,

5      who was on your team at the time, who their file

6      was not scrutinized as much as yours was?

7          A.      I would say Steve Bryson, I would say

8      Steve Bryson wasn't scrutinized as much.  He had

9      high case load.  They did unbelieveable things to

10     get cases off for him and also Mary Ann Pointer.

11     Chad Cochran had like 60 some cases.  And John



12     House cut corners that were totally against rules

13     and procedure 300 with Chad Cochran.  That is what

14     the government's DCFS, rules and procedures of

15     rules, the allegation systems.  And they cut

16     corners to get stuff off.  I mean, we had a couple

17     of his cases, but man, I know they was cutting

18     corners.

19         Q.      Okay.  Do you know, you said Steve

20     Bryson, and that was a person who was actually on

21     your team?

22         A.      Right.

23         Q.      And had the same supervisors?

24         A.      Right.

101

1        Q.    Now, Chad Cochran, what team was he on?

2        A.    He was on Debbie Tullis's team.

3        Q.    Okay.  So, he did not have the same

4     supervisor that you had during that time frame?

5        A.    Right, that's true.

6        Q.    And we are still discussing 2000 to

7     2002?

8        A.    No, Chad is a little before that.

9        Q.    Chad is before that.  Okay.  Did you

10    name someone else?

11       A.    Yeah, also named Mary Ann Pointer.  She



12    was before 2002.  She was before that.  Because

13    she had a real high case load.  And they would do

14    things so she can get stuff off.

15       Q.    Okay.

16       A.    Because when you have high case loads

17    you get pressure from the top to get these things

18    done.  And to get it all the way done.  So they

19    wouldn't keep showing up.

20       Q.    Okay.  And Miss Pointer, who was her

21    supervisor during that time?

22       A.    Deborah Tullis.

23       Q.    Okay.

24             (A break was taken, and the deposition

102

1    continued as follows:)

2    BY MS. SHALLENBERGER:

3        Q.   Okay.  Mr. Johnson, we previously had

4    talked about your request to relocate to the

5    Aurora?

6        A.   Right, that's correct.

7        Q.   To the office.  Okay.  And you said that

8    you again may have already answered this, but when

9    did you put in the request to leave?

10       A.   It was probably-- it was December, 2001.

11   Okay.  About probably the 15th, right before

12   Christmas I know it was.  I'd say about two weeks

13   before Christmas that I made the final decision

14   that hey, I'm going.  I just said hey, I'm going.

15   Like I said, I turned Aurora down before.  And

16   because my mother wasn't doing so well.  And I

17   said finally I had enough of this, I'm leaving.

18       Q.   Okay.  Do you recall if it was after or

19   before you filed your EEOC charge that you

20   requested?

21       A.   It was before.

22       Q.   Okay.

23       A.   No.  I left, I filed my EEOC charge

24   first, then I left.  Then I put in my thing to

103

1     leave the office and I opened it afterwards.

2          Q.     Without going into any attorney client

3     privilege, did anyone suggest to you that you

4     should request a geographical transfer?

5          A.     No, to me at the time I was like, it was

6     time to go.  At that point I knew that I couldn't

7     work in this environment any more.  I had enough.

8     Then I had already had enough emotional strain to

9     deal with my mother and then emotional strain to

10    deal with unfair treatment in the office.  It was

11    becoming overwhelming.

12               It came to a point the tension was so

13    thick in that office you could cut it with a

14    knife.  It got to be ridiculous.  So I just made a

15    decision on my own to go.  And that was the

16    quickest option, for me to get to Aurora was the

17    quickest option instead of going down home.  That

18    was a quicker option.  They had openings, that's

19    why I went.  They had a couple opening.

20         Q.     Was the tension that you just spoke of,

21    was the tension between yourself and a certain

22    person or are you just saying overall there was

23    tension in the office?

24         A.     Overall tension in the office.  I mean,

104

1    environment was not healthy.  I mean, for a lot of

2    my co-workers who were black.  And most of them

3    they felt the same way I felt.  But, they didn't

4    have the courage to leave.  They felt like they

5    were trapped there.  I just looked at them like

6    okay.  You stay here.  I told Marilyn Walker and I

7    was trying to tell Dorothy Goines you need to

8    transfer out of here, because I mean they going to

9    eventually fire you.  I told both of them that.

10       Q.    Do you recall ever having any firsthand

11   knowledge that you heard someone tell these other

12   people, the other black co-workers, in your mind

13   that something that was discriminatory?

14       A.    Could you repeat that again.

15       Q.    That wasn't really well phrased.  I am

16   wanting to know in any instance whether you

17   witnessed a black co-worker in your mind being

18   discriminated?

19       A.    Yes, you didn't even mention in this

20   thing Deanna Lee.  She was on call.  On call is

21   the terminology of working overtime.  Say if you

22   get called by the police in the middle of the

23   night, take some custody of kids because of

24   inappropriate home environment.  She didn't do



105

1       something appropriately or Dawn Bachtold, she is

2       the follow-up supervisor, she was yelling and

3       screaming at her because she didn't do something

4       upstairs.  Dawn called like she felt like she

5       should have took some kids to that effect, I'm not

6       certain.  But she was screaming at this woman like

7       she was a two year old, just totally disrespecting

8       her instead of calling her in to a closed office

9       with her supervisor and discuss the thing in an

10      appropriate manner.  And from that the lady broke

11      down and she was yelling at the lady.  I mean, it

12      was totally inappropriate.

13         Q.      Do you recall when that happened?

14         A.      That happened before I left.  I'd say

15      between 2000, sometime in 2001.  Before, I mean

16      2001 before I left.  Because she transferred after

17      that.  She went down to the southern region.  She

18      transferred out of there.  She got out of there.

19         Q.      Okay.  And Deanna Lee was a black

20      female?

21         A.      Yeah, she was afraid, like a lot of my

22      black counterparts they feel like they trapped,

23      they afraid to take action, that they going to

24      lose their job.  I am not afraid to do that when I

106

1    know I'm right.  They were afraid.  They had this

2    mentality in their mind that, excuse my French,

3    that they was trapped.  And that they had to

4    tolerate this type of behavior.  I said this is

5    not right to tolerate it.  She left.  She was

6    smart.  She left the office.

7        Q.    Okay.  At any time do you recall

8    management, and I'm talking about Dawn Bachtold,

9    anyone above you, I am talking about supervisors,

10   referring to anyone in a racial connotation.

11       A.    No, I did not.  I can't recollect that.

12       Q.    Did you ever hear of management ever

13   making any physical threats to any person within

14   the Urbana field office?

15       A.    No, not to the best of my recollection.

16       Q.    Okay.  Now, I want to talk about your

17   damages.  I think that you allege in here that --

18   well, actually I will go ahead and mark this as an

19   exhibit.  This is your complaint.

20            (Whereupon, Deposition Exhibit No. 6 was

21   marked for identification.)

22       Q.    I'm handing you Exhibit 6.  I think of

23   paragraph ten, now you say that you lost

24   employment opportunities in Champaign County as a

107

1    result of your relocation to Kane and Kendall

2    county. ·Did you have any Champaign employment

3    opportunities?

4        A.    Basically I mean I didn't want to leave.

5    I was like, I was really forced out.  I've been

6    living here in the area for like in Bloomington

7    Normal like about maybe 14, 15 years.  And I

8    wasn't planning, but I was forced to go.  I had no

9    alternative.  So I couldn't no longer work in an

10   environment where I wasn't welcome.  So, I had to

11   go.  So I wasn't planning on going no where.  It

12   didn't make sense where I got a critically ill

13   mother who is dying of cancer to go all the way to

14   Chicago and drive 300 miles where I could drive

15   160.  So, that's what I'm trying to say to you.

16       Q.    Did you ever find out whether there was

17   any openings closer to your residence in

18   Bloomington?

19       A.    I couldn't go to the Bloomington office,

20   Becky Jones was over that in the central region.

21   I looked down south because I would have preferred

22   working in East St. Louis, I know the area, I know

23   everything, it was like home down there, but they

24   had no openings at the time.  So I had to go to



108

1    Aurora.

2        Q.    How do you know they did not have any

3    openings?

4        A.    I tried at the time.  I couldn't find

5    any.  See, you got to have a waiting period, then

6    you got to have an opening, other people bid on

7    the jobs and other people took those jobs up.  And

8    I wasn't lucky to have more seniority than I had

9    at the time and they got those jobs, so they

10   filled those slots.

11       Q.    But you do submit something that tells

12   the human resources that you are selecting your

13   preference?

14       A.    Right.  Right.  That's true.

15       Q.    Okay.  And did you only select Glen

16   Ellyn as your first preference and Aurora as your

17   second preference for geographical transfer?

18       A.    Yeah, but I called down there and then I

19   looked on the computer and then I called down to

20   St. Clair office and they had other people.  I

21   can't recollect who I talked to, but she said

22   other people was going to fill those positions.

23   So, I couldn't get in those peoples because they

24   had more seniority.

1        Q.      And when was this?

2        A.      This would be, this was, like I said,

3    probably in 2001, and probably in November, I was

4    trying to asking questions about that down there.

5    And like I talked to a person, I forget who I

6    talked to down there.

7        Q.      In the East St. Louis office you talked

8    to a person down there?

9        A.      Yeah, I can't recollect who I talked to.

10   But they said positions will probably be filled by

11   people with more seniority.  When you have more

12   seniority they bump you out of the position.  They

13   get the position regardless.  Unless the

14   supervisor feels that you are incompetent and you

15   can't do the job.  And then you have to write a

16   special report why they wouldn't hire you.

17   Normally you a shoe-in for that type of position.

18       Q.      Okay.  Do you remember if that

19   conversation took place in the human resources

20   office or --

21       A.      No, just local.  I talked to a local

22   person down there about the openings.  Might have

23   been an investigator or case worker, I'm not for

24   sure.  I just was getting information about what

1     they had.  This is normal calling, asking what's

2     going on, do you have an openings.  How is it

3     going to be filled.  That type to that effect.

4         Q.    So in your complaint when you refer to

5     that you suffered employment, loss of employment

6     opportunities in Champaign County, you are

7     referring to only the DCFS office?

8         A.    Right.

9         Q.    You weren't pursuing other job

10    opportunities outside the department of children

11    and family services?

12        A.    I was thinking about it, but no, that's

13    correct, what you said.

14      · Q.    Okay.  And also you state that you

15    incurred relocation expenses and additional living

16    expenses.  To the relocation expenses, I think you

17    submitted some documentation of a U-haul expense,

18    is that what you are referring to?

19        A.    Yeah, for example, I knew my landlord, I

20    paid him three hundred dollars to close to a

21    thousand dollars in rent.  I went from paying, you

22    know, a month up in Chicago.  I went from paying .

23        ---

24        Q.    Were you previously -- okay.  Your

111

1       residence in Bloomington, did you own your home or

2       were you renting?

3              A.    No, I was renting from a friend of mine.

4              Q.    Was that a one bedroom or two bedroom?

5              A.    One bedroom.

6              Q.    What are you renting in Aurora now or at

7       the time that you moved?

8              A.    I was living in Lombard.  It bordered

9       Glen Ellyn.  Off of 355 in the west suburbs.  And

10      my rent was like I think it was $899, $900, but it

11      gave me a discount.  It was regularly a thousand

12      because I had a move-in special.

13             Q.    And was that a one bedroom, two bedroom?

14             A.    A one bedroom.

15             Q.    And was it --

16             A.    With a garage.

17             Q.    Okay.  Did your place in Bloomington

18      have a garage?

19             A.    No, it was the bare minimum.  It was

20      three hundred dollars.  It was the bare minimum.

21      I knew everybody else was paying like four or five

22      hundred dollars, but I knew my landlord.

23             Q.    Would you say that your apartment

24      yourself was nicer in Aurora than it was in

112

1      Bloomington?

2          A.      The place I lived in Lombard was like a

3      country club.  Bloomington was like I could have

4      been a hill billy where I lived in Bloomington.

5      It was a joke, to be honest with you.  I lived

6      like a country club; indoor/outdoor swimming pool,

7      jacuzzi, anything, tennis courts.  Family room.

8      Weight room.  Everything.

9          Q.      Sounds nice.

10         A.      But I don't live there any more now.

11         Q.      Okay.  When did you move?

12         A.      I moved March, I bought me a place in

13     Geneva, St. Charles area.

14         Q.      March, 2003?

15         A.      Yeah, the 17th I closed, the 19th I

16     closed.

17         Q.      So you own your home?

18         A.      Yeah, I own my own place.

19         Q.      Congratulations.

20         A.      Thank you.

21         Q.      And that is in the St. Charles, Geneva

22     area?

23         A.      Yeah, I live in Geneva.

24         Q.      That is a nice area.



113

1        A.    It's an investment.  That's why I moved
2    there.

3        Q.    So, do you have any intentions of
4    possibly moving back to the Bloomington area or
5    the Champaign-Urbana area?

6        A.    You know, at this point I thought about
7    it.  People be calling me wanting me to come back.
8    I mean, to tell you the truth I could never come
9    back.  Just the experience, to tell you the truth
10   even driving over here these past, I met with Bob
11   on Friday and Ruth, I tell you it's too many bad
12   experiences.  I would never come back, to tell you
13   the truth, being honest with you.  Too much
14   negativity here.

15       Q.    Okay.

16       A.    I would never move back.  It's more, how
17   would I say?  It's more diversified up here.
18   Where I stay at it's mostly white, which is fine
19   with me.  But everybody cool.  But it's more
20   diversified up there.  It's more level playing
21   ground to me up there versus here.  Where down
22   here I never had an opportunity to be a TA,
23   supervise the units, up there I'm supervising both
24   units.  They slow up on me when I need time to

114

1    carry out the case loads, but they could have me

2    running the show.  All this stuff.  It's fair.  It

3    feels good to get fair treatment in an office that

4    where it should be the way it should be.  It feels

5    great.  Me and my supervisor, both of them, we

6    right here on a good level.  They know I know my

7    stuff.

8        Q.    What race is your immediate supervisor?

9        A.    Caucasian.

10       Q.    Was that the immediate supervisor that

11   you had at the time that you transferred in March

12   of 2002?

13       A.    No.

14       Q.    What was the name of that immediate

15   supervisor?

16       A.    It was Amy Apperson.

17       Q.    And what was her race?

18       A.    White.

19       Q.    Okay.

20       A.    Only reason I don't have her as a

21   supervisor now, we had a supervisor leave, an

22   older one retire when they had the state

23   retirement, that special plan, and she transferred

24   over to another team because she wanted her to run

115

1     that unit.  So that's why we not together right

2     now, but I mean both of them, I look at both of

3     them as my supervisors.  And they put the

4     responsibility on me to run the office because

5     they know I know what I'm doing over a team of

6     about nine, about ten investigators I supervise

7     like in the summer.  I was there doing it for a

8     month for them and I just did it recently.

9         Q.    Did you receive a pay increase when you

10    transferred to the Aurora office?

11        A.    I say yes and no.  No, I didn't receive

12    a pay increase.  I work more overtime up there in

13    the Aurora office.

14        Q.    Okay.  And do you know the supervisor of

15    Amy Apperson in the Aurora office?

16        A.    They don't have a child protection

17    manager any more.  Her name is Jean Flynn.  They

18    have office managers.  Then above that is

19    Marjorie.  She is administrator.  She is in the

20    capacity like Becky Jones.

21        Q.    Okay.

22        A.    I don't know Marjorie's last name.  She

23    is housed out of Joliet I think.

24        Q.    And before Marjorie is?



116

1          A.      Before Marjorie is, who is it?  We had a

2     guy just leave.  I think it's Ardis Cook.  She

3     just that temporary person like Deb Kennedy.

4     People really don't want that job.  The head of

5     the region, I don't know about.

6          Q.      Do you know the race of Jean Flynn?

7          A.      She is white female.

8          Q.      Do you know the race of Marjorie?

9          A.      She is black female.

10         Q.      And the race of Cook?

11         A.      Ardis Cook is a black female.

12         Q.      Okay.  You also state in paragraph ten

13    of your complaint that you have suffered

14    embarrassment, humiliation, emotional distress,

15    loss of reputation.  Did you ever seek any medical

16    assistance?

17         A.      No, I didn't seek no medical assistance.

18         Q.      Okay.  As a result of, let's just say

19    from 2000, January of 2000 to present, did you

20    ever seek any psychological assistance?

21         A.      No, I didn't.  I didn't have the time.

22    My mother was sick at the time.  I had to deal

23    with the situation at hand.

24         Q.      Okay.

117

```
 1        A.    I had to make sure she was okay.  I
 2   dealt with that office.  But I tell you I was
 3   paranoid a lot, and felt like somebody was
 4   always -- they was looking over my shoulder all
 5   the time.  It was just blatantly right there.
 6   And I wanted to, but I never had the opportunity.
 7        Q.    So you do not have any medical bills?
 8        A.    No, I do not.
 9        Q.    Okay.  And also you said other
10   employment opportunities.  Do you know what you
11   referred to that you suffered a loss of other
12   employment opportunities?
13        A.    Where are you talking about?
14        Q.    I'm referring to paragraph ten, after
15   humiliation, emotional distress?
16        A.    I'm talking about other employment
17   opportunities.  Like for example, I interviewed
18   for a job, had to do with a supervisor level,
19   which I'm glad I didn't get.  Deb Kennedy, I
20   didn't get the job, but you couldn't go no further
21   in the office once they blacklist you within the
22   central region.  You couldn't get other employment
23   opportunities as far as being a supervisor or
24   going to different areas where it was management.
```

118

1    If I wanted to pursue those opportunities up north
2    I become a supervisor, a manager if I choose to do
3    so.  But I don't because it's more where I work at
4    now, is more opportunities for me right now.

5        Q.    Did you ever attempt to achieve a
6    supervisor position in the Urbana field office?

7        A.    No, I did not.  But I did interview Deb
8    Kennedy for another position on the supervisor's
9    level.  I didn't get it.  But, I knew I wouldn't
10   get it when I seen her.

11       Q.    Do you know when that happened?

12       A.    I can not recall when that happened.  I
13   think Nora was still the supervisor there.  I
14   can't recall the date when that happened.  But
15   Nora still was the supervisor there.

16       Q.    Do you remember the specific job
17   position title that you applied for?

18       A.    It had to do with some kind of
19   administrator.  I think it was licensing or
20   something to that effect.  Or something.  I can't
21   remember the specific job title.  But I knew if I
22   applied for any other supervisor of the central
23   region I was blacklisted, that I wouldn't get it
24   after that.  I was like hey, forget this, I'm not

119

1    doing this no more.  It would be a wasted effort.

2         Q.   Okay.  When you transferred to Aurora

3    from the Urbana-Champaign field office, did you

4    lose any income in your pay?

5         A.   No, I did not.

6         Q.   Soon after you transferred to Aurora,

7    did you receive a pay increase?

8         A.   We get our normal pay increases a year,

9    as far as cost of living and that's about it.  A

10   cost of living because I topped out.  Yeah, a cost

11   of living.

12        Q.   How much do you make a year?

13        A.   Last year from working overtime I made

14   right at $92,000.

15        Q.   Okay.

16        A.   And that's from working overtime.

17        Q.   So what is your base salary?

18        A.   My base salary is maybe I think it's

19   about 54.  Maybe close, maybe more than that.  I'm

20   not for sure because they give us a seven percent

21   increase.

22        Q.   Okay.  And so when we talked about

23   earlier, I'm going to go back kind of in the

24   conversation, that you in the Urbana field office

120

1    were traveling and doing all the traveling for

2    your team during that time, would you have been

3    compensated overtime if you worked let's say over

4    an eight hour day?

5         A.    No.

6         Q.    Okay.  How were you compensated, how is

7    overtime given to you?

8         A.    Are you talking about in the Urbana .

9    field office, or can you restate that, please.

10        Q.    Sure.  How I guess in general is it

11   determined that you will receive overtime during a

12   certain day period or --

13        A.    In the Urbana field office it was

14   expected that you work over on your own time.  I

15   never was compensated from working over unless I

16   was on call.  To catch up on my cases I had to do

17   it on my own time.  Versus Aurora, my supervisors,

18   we get high loads of cases where we being hit,

19   they pay me for everything.  They pay me, they

20   gave me all the time I need.  Urbana did not give

21   me.  I had to use my own personal time to get my

22   cases done.

23        Q.    Did you ever receive overtime in the

24   Urbana field office?

121

1        A.    Only time when I worked on call and then
2    they would scrutinize your hours and they would
3    cut them if you said you didn't do that much
4    overtime.

5        Q.    Did you feel that other white co-workers
6    received overtime when you did not receive it, or
7    was that the general working atmosphere in Urbana
8    field office?

9        A.    You know what?  Urbana, some workers
10   didn't get their stuff scrutinized as mine.  For
11   example, I had a mileage thing with Debbie Tullis,
12   and it was worth 300 bucks, and I was going back
13   to Ford County, that is 70, 90 miles up to
14   Kankakee border.  We cover half the towns in
15   Kankakee, Ford County.  She scrutinized my thing
16   so much I lost money.  She didn't approve it, I
17   lost three hundred dollars I think the period of
18   time I was with her.

19       Q.    And that would have been prior to '98?
20       A.    Right, but it was expected in the office
21   that you wouldn't get compensated.  You got to do
22   this on your own.  But certain other people did
23   get paid for their time.  I don't remember who
24   they were.  At this point some worker, I can't

122

1    recall their names.  But, at my new location they

2    pay me for every little thing.  I mean, we got a

3    high low, they want you in there.  I'm there 12 at

4    night, two, three in the morning getting stuff

5    done.

6        Q.    So you are actually making more money at

7    the Aurora office and pretty much putting in the

8    same amount of time as you did in the Urbana

9    office?

10        A.    Right, I probably put an equal amount of

11    time, but I'm getting compensated for my time.  I

12    mean, if I knew that before I would have left that

13    office.

14        Q.    Okay.  Mr. Johnson, have we adequately

15    talked about everything that is in your complaint,

16    the reasons why you felt that you were

17    discriminated against?

18        A.    To the best of my recollection.

19        Q.    Okay.  Is there anything else that you

20    would like to, that you can think of instances

21    where you felt that you were being discriminated

22    while your white co-workers were not?

23        A.    No.

24        Q.    Okay.  No further questions.

123

1                    ·EXAMINATION BY

2                    MR. KIRCHNER:

3         Q.    I have just a couple questions.  You

4    were asked some questions about how you were

5    treated, how others on your team were treated, and

6    the questions seemed to revolve around the fact

7    that -- or let me restate this.

8              Do you remember being asked questions

9    specifically about your team members?

10        A.    Yes, correct.

11        Q.    And there were two investigative teams?

12        A.    Yes, that's correct.

13        Q.    Did the same rules with respect to

14   conducting an investigation, the time limit for

15   performing the investigation, the responsibilities

16   generally assigned to CPI at that time, were those

17   the same rules regardless of which team you were

18   on?

19        A.    Yes.  That's correct.  Everybody had the

20   same rules they would be governed by, rules and

21   procedures 300 to follow.

22        Q.    Regardless of which team you were on,

23   the expectation in following those rules applied,

24   and they were to be applied equally and evenly

124

1    across those teams?

2         A.    Correct.

3         Q.    And above the supervisors for each of

4    those teams that you named was a manager?

5         A.    Correct.

6         Q.    And the manager was to insure that the

7    supervisors applied the same rules in the same way

8    regardless of which team was at issue?

9         A.    Correct.

10        Q.    Okay.  You were asked some questions

11   about the confidentiality issue, and the question

12   was asked about whether the other individuals who

13   had committed confidentiality violations were case

14   workers or CPIs.  Do you recall being asked about

15   that?

16        A.    Yes.

17        Q.    The confidentiality rules with respect

18   to information concerning cases, individuals,

19   information generally at the Urbana field office,

20   did those confidentiality rules apply equally and

21   were they the same regardless of whether you were

22   an investigator, a case worker, or a secretary?

23        A.    Yes.

24        Q.    Okay.  I think that is all I have.

125

1               MS. SHALLENBERGER: I just have one

2        follow-up question. Mr. Kirchner indicated that

3        there were two investigative teams for CPIs, is

4        that correct?

5               A.    Yes, that's correct.

6               MS. SHALLENBERGER: I wasn't aware that

7        there were just two, but in these two

8        investigative teams, did, for one team, did it

9        have a different supervisor than the other team?

10              A.    Yes, correct.

11              MS. SHALLENBERGER: Okay.  That is all I

12       have.

13              (Signaturre waived.)

14              (Deposition adjourned.)

15

16

17

18

19

20

21

22

23

24

126

1    STATE OF ILLINOIS    )
                           )    SS
2    COUNTY OF CHAMPAIGN   )

3              I, DEANN K. PARKINSON, a Notary Public
     in and for the County of Champaign State of
4    Illinois, do hereby certify that RUFUS JOHNSON,
     the deponent herein, was by me first duly sworn to
5    tell the truth, the whole truth and nothing but
     the truth in the aforementioned cause of action.
6              That the foregoing deposition was taken
     on behalf of the Defendant on September 14th,
7    2004.
               That said deposition was taken down in
8    stenographic notes and afterwards reduced to
     typewriting under my instruction and said
9    transcription is a true record of the testimony
     given; and that it was agreed by and between the
10   witness and attorneys that said signature on said
     deposition would be waived.
11             I do hereby certify that I am a
     disinterested person in this cause of action; that
12   I am not a relative of any party or any attorney
     of record in this cause, or an attorney for any
13   party herein, or otherwise interested in the event
     of this action, and am not in the employ of the
14   attorneys for either party.
               In witness whereof, I have hereunto set
15   my hand and affixed my notarial seal September
     20th, 2004.
16
                                   _Deann K. Parkinson_
17                                 _____
                                   DEANN K. PARKINSON, CSR
18                                 NOTARY PUBLIC

19
     "OFFICIAL SEAL"
20   DEANN K. PARKINSON
     Notary Public, State of Illinois
21   My Commission Expires 11-16-2004

22

23

24



IN THE UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS

**FILED**

DEC 1 6 2002

JOHN M. WATERS, Clerk
U.S. DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
URBANA, IL

RUFUS JOHNSON, )
)
    Plaintiff, )
)
v. )
)
STATE OF ILLINOIS, ILLINOIS DEPARTMENT )
OF CHILDREN AND FAMILY SERVICES, )
)
    Defendant: )

No. 02-    **02 - 2260**
Jury Demand

**EXHIBIT**

Johnson 6

## COMPLAINT

NOW COMES the Plaintiff, RUFUS JOHNSON, by and through his attorneys, LERNER

& KIRCHNER and hereby complains of the Defendant as follows:

### JURISDICTION AND VENUE

1.     This Court has jurisdiction pursuant to 28 USC §1331 and 42 USC § 2000(e) of Title

    VII of the Civil Rights Act of 1964 as amended.

2.     That the Plaintiff, RUFUS JOHNSON, has filed a timely charge of discrimination

    with the Equal Employment Opportunity Commission and has received a Notice of

    his right to bring suit by correspondence received September 17, 2002, a true and

    exact copy of which is attached hereto as Exhibit "A" and incorporated herein by

    reference as so fully set for herein.

3.     That venue is proper under the provisions of title 28 USC § 1391(b) and 42 USC §

    2000(e)-(f)(b).

### THE PARTIES

4.     That the Plaintiff, RUFUS JOHNSON, is a resident of the State of Illinois and that

    at all times relevant to these proceedings the Plaintiff was a Child Protection

Investigator with the State of Illinois, Illinois Department of Children and Family Services.

## CLAIMS PURSUANT TO TITLE VII

5.    That from and since February 8, 2001 and at all times thereafter relevant hereto, the Plaintiff was performing his duties as a Child Protection Investigator in a manner consistent with the reasonable expectations of the State of Illinois, Illinois Department of Children and Family Services.

6.    That the Plaintiff is an African American male.

7.    That during the course of Plaintiff's employment at the Urbana Field Office, he and other African Americans were harassed and discriminated against in the terms and conditions of their employment and disciplined for matters Caucasian workers were not disciplined for, all as more fully set forth in the Charge of Discrimination attached hereto as Exhibit "B".

8.    That as a result of said harassment, the Plaintiff was forced to relocate out of Champaign County to Kane/Kendall County.

9.    That the conduct of the Defendant, by and through its agents and employees subjected the Plaintiff to discrimination as a result of his race in violation of Title VII of the Civil Rights Act of 1964, as amended.

10.    That the actions of the Defendant's agents and employees as set forth hereinabove has caused the Plaintiff to suffer a loss of employment opportunities in Champaign County, caused Plaintiff to leave the County of Champaign, incur relocation expenses and additional living expenses, and has caused the Plaintiff to suffer embarrassment and humiliation, emotional distress, a loss of reputation, and other employment

opportunities, all to his damage now and into the future.

11.     That the actions taken by the Defendants' agents and employees were with reckless disregard to the Plaintiff's Federally protected rights.

### RELIEF REQUESTED

WHEREFORE, the Plaintiff prays as follow:

A.      That the Defendants, upon a Trial by Jury, be adjudicated to have violated Title VII.

B.      That the Plaintiff be awarded appropriate damages in an amount not less than $300,000 to compensate him for his loss of income and other benefits, embarrassment, humiliation, emotional distress, loss of reputation and employment opportunities and other damages as set forth herein both now and into the future. .

C.      That the Plaintiff be awarded prejudgment interest and punitive damages in an amount to be fixed by the trier of fact, and that the Plaintiff be awarded his reasonable attorneys fees and litigation expenses.

D.      That the Court retain jurisdiction to ensure that the Defendants have remedied their unlawful policies and practices as complained of herein.

E.      That the Court grant such other and further relief as it deems just.

RUFUS JOHNSON, Plaintiff

BY: _____

ROBERT G. KIRCHNER, one of his attorneys.

Prepared By:
ROBERT G. KIRCHNER
LERNER & KIRCHNER
Attorneys at Law
Huntington Towers, Ste., 602
201 W. Springfield Ave.
P.O. Box 1340
Champaign, IL 61824-1340
Telephone: 217.356.8381
Facsimile: 217.356.7739

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | 210A2011.1 |

Illinois Dept. of Human Rights _____ and EEOC.
*State or local Agency, if any*

| ME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Rufus Johnson | (304) 452-6967 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1004 Samantha St. Apt. 2, Normal, IL 61761 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(if more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| IL Dept. Children & Family Services | Cat B (101-200) | (312) 814-6881 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 100 W. Randolph, Chicago, IL 60601 | | 031 |

| NAME | | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|---|
| | | |

| STREET ADDRESS | CITY STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(Check appropriate boxes.)*

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER *(specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 02/08/2001 | 12/12/2001 |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I began my employment with Respondent on or around December 10, 1993. My most recent position is Child Protection Investigator. On or about June 2, 2001 I was accused by a supervisor of violating a company policy and I was given discipline. My non-black co-workers violated the same policy and have never been disciplined. My job performance and work is constantly being scrutinized by my supervisors, while my non-black co-workers are not subjected to similiar treatment.

I believe I have been discriminated against on the basis of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

DEC 1 2001

**EXHIBIT**

Johnson #1

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - (When necessary for State and Local Requirements) |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| X 12-18-01   *Rufus Johnson* | |
| Date        Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (Month, day and year) |
| | 000915 |

EEOC FORM 5 (Rev. 07/99)

RESPONDENT'S COPY

386853



## AFSCME / State of Illinois
## CONTRACT GRIEVANCE

| Employee's Name | RUFUS JOHNSON | Agency DCFS | AFSCME Local No. 2971 | Date Raised at Step 1  4-30-01 |
|---|---|---|---|---|

Job Title  CHILD PROTECTION INVESTIGATOR  RC  17   Facility or Office   URBANA FIELD OFFICE

STEP 1 - Oral/Step

_(signature)_   5-1-01   5-1-01
( Date of Discussion)

Signature of immediate supervisor acknowledging discussion of grievance.   (DATE)

**STEP 2** - (To be submitted within 5 work days after supervisor's answer given or due, whichever occurs first.)

Statement of Grievance (Include facts of the complaint, sections of the Agreement violated – if applicable, and relief requested):

Mr. Johnson received an unknown report on 4-16-01 for Allegation 74.  He completed a Soundex and background check based on a license plate number that was provided on the second page of the CANTS 1.

He discovered the person the complaint was about was Sandra Reagan Gauze.  She was a licensed DCFS foster parent.  Mr. Johnson contacted the Licensing Representative, Cheryl Huffman and she accompanied him to Ms. Gauze's home.  While at Ms. Gauze's home doing the investigation, Mr. Johnson discovered that one of the children named in the report was the child of a co-worker (Linda Morgan).  Ms. Gauze was the babysitter for this child.

(Continued on separate page – attached)

EMPLOYEE _(signature)_   AFSCME hereby appeals the grievance to Step 2 _____
(Union Representative)   (DATE)

Date received by Intermediate Administrator or Designee   MAY 23 2001   _(initials)_
(DATE)   (INITIALS)

Answer (to be given within 15 working days of receipt - use attachment if additional space is required)   Date settlement meeting held _____

To resolve grievance number 386853 without precedent or prejudice. Management agrees to reduce the oral reprimand to a counseling session for Mr. Rufus Johnson.

**EXHIBIT**

Johnson 2

Signature _____ (Employer Representative)   Date _____

Signature _____ (Union Representative)   Date _____

☐ Accepted by Union   ☐ Rejected by Union

**STEP 3** - To be submitted to Agency Head (certified mail - return receipt recommended) within 15 working days after Step 2 answer was given or due, whichever occurs first. *Local must send copy to Council 31 (Include fact sheets, information and documentation with Union copy only.)*

AFSCME hereby appeals the grievance to Step 3   Signature _____ (Union Representative)   Date _____

**STEP 4** - To be submitted to Director of Central Management Services within 15 days after Step 3 sign off.

AFSCME hereby appeals the grievance to Step 4.   Signature _____ (Union Representative)   Date _____

DEPARTMENT OF CHILDREN AND FAMILY SERVICES

INTEROFFICE CORRESPONDENCE

DATE:  May 23, 2001

TO:  Rufus Johnson

**EXHIBIT**

Johnson 3

FROM:  Jamie Ralph, Child Protection Manager

RE:  Counseling Session

On May 23, 2001, at 3:00 pm you received a counseling session regarding confidentiality.  It was discussed that information obtained during your official job capacity is not to be shared with others either inside or outside the DCFS office.

000980

IN THE UNITED STATES DISTRICT COURT1
FOR THE CENTRAL DISTRICT OF ILLINOIS
URBANA DIVISION

RUFUS JOHNSON,                              )        No. 02-2260
                                            )        JURY DEMAND
    Plaintiff,                            )
                                            )
                                            )
vs.                                         )
                                            )
STATE OF ILLINOIS, ILLINOIS DEPARTMENT      )
OF CHILDREN AND FAMILY SERVICES,            )
                                            )
    Defendant.                            )

**EXHIBIT**
Johnson #2/

## ANSWERS TO INTERROGATORIES PROPOUNDED TO THE PLAINTIFF

NOW COMES the Plaintiff, RUFUS JOHNSON, by and through his attorneys, LERNER

& KIRCHNER, and hereby answers the Interrogatories propounded to the Plaintiff pursuant to

Federal Rule of Civil Procedure 33, under oath, as follows:

    **1.**     **State with particularity the actions, inactions, innuendos and statements
allegedly made by employees of Illinois Department of Children & Family
Services which you believe constitute race discrimination. For each such
response, give the date, location and position of the Illinois Department of
Children and Family Services employee, the circumstances of the alleged
comments and the names of any witnesses.**

**Response**

The environment at the Urbana Field Office was a racially hostile atmosphere present on a daily
basis and ubiquitous manner that was created by supervisors' racially targeted and hostile actions
and statements, their refusal to act toward and treat black staff members, including child
protection investigators, case workers and case workers' aides, the same way they treated white
staff members or to stop their subordinates (other supervisors) from the racially hostile behavior
and statements they made toward black employees.

The climate created by management at DCFS created a tense atmosphere for black employees as
management's visible targets for disciplinary action and ostracism, often in front of other co-
workers. There were special meetings held on the racism in the office and management's failure to
do anything about it.

Without limiting the breadth of the racial discrimination and the actions, inactions, innuendos and statements made by employees of the Illinois Department of Children & Family Services at the Urbana Field Office, they include, but are not limited to the following incidents:

a.   Scrutiny of closed investigation file and accusation of falisifying case notes – In April 2000, at the Urbana Field Office, I had an in-person conversation with Dawn Bachtold (a follow-up supervisor). I discussed the Canas Report with Dawn because she was OPWI on report. My supervisor Nora Harms read off on the report and approved it.   Two weeks after my report had been approved by Nora Harms Dawn Bachtold accused me of falsifying case notes. Stacy McAdams heard the conversation between me and her. Dawn reviewed my closed file and removed the 17A investigation note. On April 18, 2000, Dawn Bachtold sent my Supervisor Nora Harms a written memo on the computer. Dawn accused me in the memo of falsifying 17A's notes. In May 2000 I received a written memo from Maria Miller (Child Protection Manager). Ms. Miller scheduled a pre-disciplinary hearing with me and union representatives.   The follow-up supervisor normally doesn't review closed investigation files. This is not standard practice. My white workers were not treated in this manner. White work did not have follow-up supervisors review their closed file to remove material from the case.

b.   Higher number of case assignments – Throughout my time at the Urbana Field Office, a higher number of reports were assigned to me than were assigned to my white co-workers. This seemed to me to be a deliberate attempt to get me to be overdue in turning in my reports.

c.   Extensions given to white employees but not to me – White workers were given extensions requested for overdue reports. For example, a white coworker, Jan Warwick, was constantly having overdue reports and management gave her extensions. It was very difficult for me to get extensions granted on any potentially overdue reports I thought I might have.

d.   White workers taken out of rotation when they had high case loads while I was not. I was also threatened with discipline if my reports weren't going to be turned in on time – When white workers had 'high' caseloads, management took white workers out of rotation to receive new reports until the white workers had a lower caseload. Management never gave me the opportunity to be taken out of rotation when my caseload was 'high'. I continued to receive cases when my caseload was high and threats of discipline if the work was not turned in on time.

e.   Disparate disciplinary action for breach of confidentiality. – I was disciplined for an alleged breach of confidentiality for talking about a case inside my own office. A white employee was not disciplined for disclosing the information she heard me talk about when she was visiting a co-worker in my office that she later discussed throughout the Urbana Field Office. Specifically, on April 19, 2001, I was assigned a Sandy Gauze Report. I went to the house and found a white coworker's child at the residence. I attempted to talk with Debra Tullis (Child Protection Supervisor), but she was staffing a case with another worker, so I discussed my concerns with my coworkers Carol Davis-Hargest and Heather Forest inside my office which I share with them and one other coworker. Since Ms. Pamela Wendt was usually in our office when working out of the Urbana Field Office, I assumed it was her. Later I found out that the worker was not Ms. Wendt, but instead

Lisa Sanders, a white co-worker, who was visiting Heather at the time. I briefly discussed the case with my coworkers in my office. Lisa Sanders discussed my case throughout the office with other coworkers. Lisa Sanders (a white worker) breached confidentiality for discussing a case throughout the Urbana Field Office, but received no formal discipline. I, on the other hand, was given an oral and written reprimand for breach of confidentiality when I did not discuss this case outside my own office. Management said I "said it out loud in my office," and this was why I was disciplined. April 19, 2001, Dawn Bachtold sent my supervisor (Nora Harms) a written memo. Dawn accused me of breach of confidentiality on Sandy Gauze's report. My supervisor Nora Harms notified Jamie Ralph (Child Protection Manager) and he conducted a formal investigation at the Urbana Field Office. On April 25, 2001, Nora Harms notified me that I received an oral and written reprimand for breach of confidentiality in my personal file. White co-workers discussed cases every day inside their offices and they are not disciplined for discussing cases. My white coworker Lisa Sanders confirmed for me that I did nothing wrong.

f.    Failure to discipline white employees for serious breaches – Another time, my white coworker Lynda Morgan left five investigation files inside her car at a mall parking lot. The files were never found. Lynda notified Nora Hamrs (DCP Supervisor) and she received no formal discipline. This was a serious breach. White workers could make mistakes like this on cases and not face disciplinary action. If I or other black employees lost files, management would certainly have disciplined or fired me or the other black employees who had lost files.

g.    Managers/Supervisors create and foster a hostile atmosphere for Plaintiff and other black employees

    1. On June 8, 2000, Maria Miller (a Child Protection Manager) suspended me for 10 days for allegedly falsifying 17A's case notes. Ms. Miller screamed at me real loud in the office in a very degrading tone of voice. She said, "You need to give it up, because management does not believe you." I broke down and cried during this incident. Nora Harms was present. She yelled loud enough that other people outside the office may have also heard.

    2. I attended a child protection meeting to address staffing issues at the Urbana Field Office. Deb Kennedy (the Regional Administrator) attended the meeting with about 8 or 9 workers. Deb Kennedy said: "Becky Jones is not a racist." Then she laughed real loud. Black workers were complaining about Becky, but Deb did nothing.

    3. Pat McFall, a DCP Secretary, came to my office and indicated that I needed to be careful because management was watching me. I understood that Pat was referring to Becky's racist tactics with black workers in the office. I explained to Pat that my cases are low and I turn my work in on time. Despite this fact, Becky had Jamie Ralph monitoring me at the office.

    4. On March 18, 2001, I returned from St. Louis, MO for a relative's funeral. Pat McFall told me that Jamie was counting the days I was gone. I had plenty of sick family time and there was no legitimate reason why Jamie should have been so concerned about my absences that he would count the days I was gone. This was just another example of the scrutiny that I as a black employee in the Urbana Field Office at DCFS was under.

5. Becky Jones and Jamie Ralph were constantly scrutinizing my job performance and monitoring me for no legitimate reason. Some of my white coworkers had overdue reports and high caseloads but were not scrutinized like I was. Becky and Jamie would have the white employees with high case loads taken out of rotation to receive a new report and no formal disciplinary action was taken when they were behind in getting their reports turned in.

6. Nora Harms told me on several occasions that management was watching me. Nora was referring to Becky's and Jamie's discriminating behavior towards me. Becky was trying to set me up to be fired even though I had an excellent work record. These conversations took place between July 2000 and Sept. 2001.

7. When I was going to Nora's office to put one of my completed reports inside her office, Becky's Secretary Glenda Ready told me that she didn't want me to get in trouble for walking in Nora Harm's office while Nora was gone. I explained to Glenda that Nora told me to put all completed reports inside her office. After Glenda made the above statement to me, I knew Becky had Glenda watching me. This contributed to the very hostile work environment for me and other black employees. I felt that Becky was trying to find any reason to discipline me and retaliate against me for recently winning my grievance through the union.

8. Another time, Dawn Bachtold was yelling at DeAnna Lee, a black employee, in the hallway at the Urbana Field Office in front of her co-workers because Dawn thought Deanna did a poor job working "on-call" (overtime). Dawn disagreed with how Deanna handled a case. Dawn humiliated and degraded Deanna Lee and had Ms. Lee crying in the hallway in front of her co-workers. Deanna filed a grievance with Vern Carty. Ms. Lee transferred out of the Urbana Field Office.

9. Erica Collins, a former coworker who is black, complained to me about Becky Jones being a racist and how Becky will go after other black workers in the Urbana Field Office. Management settled with Erica Collins out of Court. Vern Carty should have details of her union grievance on file (June 1998-99).

10. Eric Schwann, at the time a white coworker (he no longer works in the Urbana Field Office), stood up for black workers in Urbana Field Office. Eric was on Dawn Bachtold's team and she targeted him because he did not go along with the racism in the office. Dawn had Eric suspended for 30 days. Becky Jones gave the order to fire Eric after his suspension.

11. Dorothy Goines, a former black coworker from the Urbana Field Office, was suspended for 10 days because Becky Jones accused her of lying in Court. Becky had Dorothy suspended again and Dorothy took sick leave because she could not deal with Becky's and the other's discrimination in the Urbana Field Office. Becky also gave the order to fire Dorothy.

12. Becky Jones, Jamie Ralph, Dawn Bachtold, and Maria Miller created a very hostile, degrading and harassing work environment. Management was constantly scrutinizing my job performance. Becky Jones and Dawn Bachtold are racists. Becky and Dawn tried for two years to set me up to fire me. I was the best investigator in the Urbana Field Office.

13. Becky favors white workers and in her eyes they could do no wrong and white workers who did not complain about management's racist actions received no discipline under Becky's management.

2. How was the above described conduct made known to the Defendant? For each such entry, state the date of any conversation or written notification (specifying whether the notification was in writing or oral), who were the parties to any such communication, what was stated and where the conversations occurred or the location where the communication was directed.

**Response**

The actions, inactions, innuendos and statements made by employees of DCFS described above in the answer to the first interrogatory also include the dates of the incidents when such incidents were not on-going, reference whether the incidents were made through oral or written communication, the parties to the communication, where the conversations occurred or from where they were directed.

Additionally, Vern Carty, my union representative, sent several memos to Deb Kennedy and possibly others regarding harassment at the Urbana Field Office.

3. State all responses of each person to whom you communicated the alleged offensive conduct. (For this response, be specific and identify the names of persons who communicated with you, whether the communication occurred, any conversations that preceded or succeeded the response (and all parties to these conversations and communications) and describe the response).

**Response**

The responses of each communication and the surrounding details are described in the response to Interrogatories No. 1 and 2.

Additionally,

On April 19, 2001, I had an oral conversation with Nora Harms inside her office (at the Urbana Field Office). Nora asked me if I talked with anyone outside my office about Sandy Gauze's Report. I told Nora that I did not discuss the case outside my office. I did staff the case with Debbie Tullis (DCP Supervisor) inside her office. I had an oral conversation with Vern Carty (union representative) to notify him of the breach of confidentiality reprimand I received. He wrote a formal grievance complaint. Nora Harms, employed by the Defendant as a Supervisor, reviewed the grievance and advised me that no relief could be provided to me at "this level". Nora Harms further advised me that the Defendant felt that I had breached confidentiality. Nora Harms signed the grievance and returned it for further processing.

4. State with particularity all conversations and written communications Plaintiff had with employees at the Illinois Department of Children & Family Services. For each such entry, state with whom Plaintiff communicated, the date of the communication, the contents of the communication, and (if oral) where the conversation occurred.

Please see responses listed above in Interrogatories 1, 2, and 3 for details about conversations and

other communications I had with employees of DCFS.

5.    Please state fully the facts on which you base your allegations that you were retaliated against and include the following information: the specific date and time of each action you deem to be retaliatory; the individual performing the action you deem retaliatory; and the identity of any witnesses to these retaliatory acts.

Please see the information stated in the preceding answers to Respondent's interrogatories 1, 2, and 3, for the facts on which these allegations are based, including dates and times of retaliatory and discriminatory acts. Because the discriminatory action also included a decision to not discipline white employees who committed similar or worse infractions than I was accused of committing, and because the behavior and treatment I received was in many ways a continuing act, dates and times cannot be provided for all of the incidents.

Without limiting the breadth of the retaliation and racial discrimination created through the actions, inactions, innuendos and statements made by employees of the Illinois Department of Children & Family Services at the Urbana Field Office, they include but are not limited to the following incidents:

a.    On Feb. 16, 2001, I won my first grievance for alleged misrepresentation of 17A's investigations case note a Springfield judge ruled in my favor. Management was shocked and really upset that I proved them wrong. On May 18, 2001, I returned from St. Louis from a relative's funeral. Pat McFall (DCP Secretary) said I "need to be careful because management is watching you," and indicated she witnessed Jamie Ralph (DCP Manager) counting the days I was gone even though I had plenty of sick/family time-off. There was no legitimate reason Jamie should have been counting the days I was gone.

b.    Nora Harms (DCP Supervisor) told me on several occasions between July 2000 and Sept. 2001 that management is watching me and I need to be careful. I explained to Nora that my cases are low and I was turning all my work in on time.

c.    Glenda Ready (Becky Jones' secretary) told me she did not want me to get in trouble for walking inside Nora's office when I went to her office to place a file in there, even though Nora had told workers to put completed files inside her office. After Glenda made this statement I knew Becky Jones and Jamie Ralph had employees watching me at the Urbana Field Office. Becky Jones had Jamie Ralph constantly scrutinizing my job performance and monitoring me for no reason other than to harass and intimidate me.

6. Please describe in detail the manner and method by which you or someone on your behalf notified the Defendant of the alleged acts that you claim led to your being reprimanded, specifying the date, manner and person notified for each instance of notification and the form of redress you sought.

a.    Vern Carty and Rick Prince filed grievances on my behalf April 2000 on alleged misrepresentation of 17A's notes. (Management accused me of falsifying interview notes.) Vern and Rick notified Maria Miller, Nora Harms, and Deb Kennedy (Management) in a written Formal Grievance letter. The grievance sought to get charges

dropped for falsifying 17A's case notes and removed from my personnel file.

b.  On April 25, 2001, I received a reprimand for breach of confidentiality for the Sandy Gauze report I investigated. In April 2001, Vern Carty and Rick Prince notified management in a written grievance letter. I sought to get the reprimand removed from my personnel file.

c.  Additionally, I am aware the Defendant has had black employees in the past complained to Defendant of racism by management in the Urbana Field Office.

d.  I am also aware that Vern Carty has sent Deb Kennedy several memos regarding the harassment I and others endured at the Urbana Field Office.

> **7. Please state whether you have made any prior complaints, either formally or informally, of race discrimination. If you respond affirmatively, for each complaint please provide the following information: the identity of the individual or entity that was the subject of the complaint; the date of each complaint; the names and titles of the persons with whom the complaint was lodged; and the outcome of each complaint.**



### Response

I have complained informally about the problem of race discrimination numerous times, complaining repeatedly to co-workers, union representatives, and management. Because DCFS would not address the racially hostile atmosphere at the Urbana Field Office that was so bad that even white employees noticed the racial discrimination, I finally decided to file a formal complaint of race discrimination with the Equal Employment Opportunity Commission.

I am aware that other black employees have made complaints for years regarding race discrimination in the Urbana Field Office and little or nothing has been done.

For example, in May 2001, Marsha Carter and Dorothy Goines had an oral conversation to notify me that black workers were going to have a meeting at Carol Hargest's home to discuss how I and other black workers were being unfairly disciplined compared to white workers. They cited the example of Bill Gordon (a white worker) who turned in a late Court report the day of Court and he received no formal discipline, but Carol Hargest ( a black worker) turned in a late Court report a few days before Court and received formal discipline by management.

I did not attend this meeting because I decided to work through the union that time. The black workers at the meeting were Louis Drake, Marilyn Walker, Marsha Carter, Lawanda Carter, Carol Hargest, and Beverly Bell. These workers were all afraid for their jobs, because they knew they could be next to be disciplined or fired.

> **8. Were you afflicted with, or suffering from, any medical and/or mental conditions before, during or after the alleged occurrences. If your answer is in the affirmative, please state as to each condition: a full and complete description of the condition; the duration of time, in months and days, that you suffered from such condition; any treatment received for the condition; the names and addresses of any doctors or hospitals that participated in the**

treatment; the dates of any treatment.

I was not suffering from any medical or mental condition during or after the incidents of discrimination, but I was under a tremendous amount of stress at the Urbana Field Office due to management's racially discriminatory and retaliatory practices. I witnessed management target other black workers (Erica Collins and Dorothy Goines, for example). These black workers were forced to move out of the office or be fired. I knew from their statements, behavior and action that they were also targeting me. I also knew that management knew my mom was dying from cancer during this time and they tried to mentally brake me down with their hostile behavior and actions. They knew I needed the job to pay for my mom's medical expenses.

> **9. List your educational history. For each entry, state the name, address, and telephone number of the educational facility and all degrees received and the dates you received said degrees.**

I received the following degrees from:

> Illinois State University
> Box 2202
> Normal IL 61790-2202
>
> Phone number: (309) 438-2188

1.   Master of Science Degree – Dec. 19, 1988
2.   Bachelor of Science Degree – Aug. 6, 1983

> **10. List your employment history for the last twenty years. For each entry, give the dates of employment, starting and ending salary, job title, job duties. For any lapse of employment greater than two weeks, state the reason for not being employed.**

1.   Dec. 10, 1993 to present – DCFS: $30,000-$64,000/Child Protection Investigator. Investigate child abuse/neglect.
2.   Dec. 1992-Dec. 1993 – Human Service Center in Peoria, IL. $22,000-$25,000. Counselor, counseled abused/neglected children.
3.   Jan. 1988- Dec. 1992 – Youth Services of Mid-Illinois. $12,000-$17,000. Youth Counselor at night, monitor DCFS wards in group home.
4.   Jan. 1985-Jan. 1988 – Posh Mosh Restaurant $6,000-8,000, catering manager, catered weddings and parties.
5.   Dec. 1983-Jan. 1985 – Hooter's Bar and Restaurant. $5,000-$7,000, Bartender and assistant manager, served drinks and monitored business operations.
6.   Dec. 1981- Dec. 1983 – Big Rudy's Bar and Restaurant. $3,3000- $7,000. Bouncer and assistant manager. Checked i.d.'s at door and monitored business operations.

> **11. List all starting and ending dates that you have collected worker's compensation, unemployment, social security, retirement, or disability benefits. For each entry, state from whom you collected, how much you collected, and under what circumstances you collected these benefits, including a description of any injuries, the duration of any limitations and whether any of your injuries are permanent or whether you received an award for partial or full disability.**

I received unemployment when I was laid off from Youth Services of Mid-Illinois in 1988. I received unemployment benefits for six months.

> **12. State the names and addresses of all persons, including experts, having knowledge of the facts, circumstances, or other matters alleged in the complaint and a list (or copy) of all unprivileged documents or written or oral communications that were given to such persons.**

See Rule 26 Disclosure.

> **13. State the names, addresses, and telephone numbers of all persons, including experts, having knowledge of all injuries and damages allegedly caused or aggravated by the occurrence alleged in the complaint.**

See Rule 26 Disclosure, including:
1. Vern Cary (union representative), 2125 S. First St., Champaign, IL 61820.  Phone (work) 278-5888

2. Rick Prince (union representative)  615 S. 2nd St./ PO Box 2328 Springfield, IL.  Phone (work) (217) 788-2800.

3. Jessica Antonucci, EEOC Investigator, 500 W. Madison St., Suite 2800 Chicago, IL Phone (work) (312) 353-7319.

> **14. Please give an account, itemized as fully and as carefully as you can, of all losses and expenses which you claim are incurred by you, or on your behalf, as a result of the alleged violation, including but not limiting your answer to those losses or expenses which are attributable to loss of wages and benefits, emotional injuries, legal expenses and Court costs and include the manner in which you arrived at your figure for compensatory damages.**

I incurred the actual costs of moving, the deposit for my new apartment, as well as the ongoing higher monthly rent that continue today and will continue into the future.  Additionally, there is a higher cost of living in the suburbs than there is downstate.  I have also incurred  legal expenses

and the Court costs associated with this case.

I have suffered injury because I and other African Americans were harassed, discriminated against and retaliated against in the terms and conditions of our employment in the Urbana Field Office of DCFS and were disciplined for work that our Caucasian coworkers were not disciplined for or were disciplined to a lesser degree. Because of the way I was treated at the Urbana Field Office, I suffered embarrassment and humiliation, emotional distress, a loss of reputation, other employment opportunities and other damages.

Because of the harassment, discrimination and retaliation I suffered at the Urbana Field Office due to my race being African American, I suffered a loss of employment opportunities in Champaign County, had to leave Champaign County in order to work in the field in which I was trained. I was forced to relocate to another area from the community that I had worked in, had a strong working relationship with people in the field in, had friends in, become so familiar with, and considered my home.

Management created a very humiliating, degrading, and hostile work environment. I went through at least two years of being discriminated against by management. Black workers, including me, are treated like second class citizens in the Urbana Field Office. There is no amount of money that can compensate me for the emotional distress and the racist work environment in which I suffered through at least two years of my life.

Rufus Johnson

By: _____

Robert Kirchner, one of his attorneys

F:\WPDOCS\BOB\Johnson, Rufus\Plaintiff's Answers to Defendant's Interrogatories 10-28-03.wpd

**EXHIBIT**

Johnson #5

### State of Illinois
### DEPARTMENT OF CENTRAL MANAGEMENT SERVICES
### Springfield, Illinois

MAY 1 4 2001

## INDIVIDUAL DEVELOPMENT AND PERFORMANCE SYSTEM

| 1. EMPLOYEE'S NAME - LAST, FIRST, MIDDLE<br>JOHNSON, RUFUS | 2. DEPARTMENT, BOARD OR COMMISSION<br>IDCFS | 3. DIVISION OR INSTITUTION<br>CHILD PROTECTION |
|---|---|---|
| 4. EMPLOYEE'S SOCIAL SECURITY NUMBER<br>█████ | 5. EMPLOYEE'S PAYROLL TITLE<br>CHILD PROTECTION INVESTIGATOR | 6. TIME IN CURRENT TITLE<br>7 YEARS  0 MONTHS |

| 7. PERIOD OF REPORT<br>FROM  1/1/2000   TO  12/31/2000 | 8. TYPE OF REPORT<br>☒ ANNUAL<br>☐ LAYOFF | ☐ FIRST PROBATIONARY<br>☐ SALARY INCREASE<br>☐ DISCHARGE | ☐ FINAL PROBATIONARY<br>☐ INTERIM<br>☐ OTHER(SPECIFY) |
|---|---|---|---|

### GENERAL INFORMATION

The basic purpose of the Individual Development and Performance system is to let employees know how they are doing, to motivate them, to improve their performance and to justify administrative personnel decisions.

The system attempts to minimize subjective judgements by utilizing a work planning concept of objective setting and feedback. Thus, it helps employees control and evaluate their progress toward personal as well as organizational objectives.

The establishment of employee objectives is a five-step process which is illustrated as follows:

| SUPERVISOR'S RESPONSIBILITY<br>Set and communicate appropriate objectives. | ▶ Prepare a list of objectives with employee. Discuss work objectives for this period. | ▶ Approve plans of action for achieving work objectives and review with higher management | ▶ Review progress. Make adjustment as required. Provide coaching and assistance. | Evaluate performance and results for annual appraisal. Prepare list of objectives for next period. |
|---|---|---|---|---|
| INFORMATION TO BE SHARED<br>Organization objectives; major job responsibilities; self-development needs. | OBJECTIVE SETTING | ▶ PLANS OF ACTION FOR JOB TO BE DONE | ▶ QUARTERLY PROGRESS REVIEW | EVALUATE PERFORMANCE ANNUALLY RESET OBJECTIVES |
| EMPLOYEE'S ROLE<br>Discuss areas of responsibility relating to objectives and self-development needs. | ▶ Prepare a list of objectives for discussion with supervisor. Discuss work objectives for this period. | ▶ Prepare plans of action to meet objectives for approval of supervisor. Perform the job to be done. | ▶ Review progress and discuss any problems with supervisor. | Make self-evaluation and evaluate results for annual appraisal. Prepare list of objectives for next period. |

Each employee will be counseled by his supervisor and a copy of this form filed in the individual's personnel folder not less than once every twelve (12) months. Results of quarterly progress review sessions need be recorded only on copies retained by the employee and the supervisor. A manual is available which may be obtained from the Department of Central Management Services, Bureau of Personnel.

A minimum of three (3) copies of this form will be prepared - one for the supervisor, one for the employee, and one for the personnel files. Additional copies may be prepared if needed. If employee's position is at a level (unskilled, etc.) that does not lend itself to objective setting, indicate by inserting "N/A" (Not Applicable) wherever necessary.

| EMPLOYEE'S NAME — LAST, FIRST, MIDDLE |
|---|
| JOHNSON, RUFUS |

## PART I. APPRAISAL OF OBJECTIVES

Supervisor is to list and evaluate all objectives for which the employee was held accountable during the last reporting period. Mark the appropriate column for each objective.

| | OBJECTIVES | | |
|---|---|---|---|
| | EXCEEDED | MET | NOT MET |
| SEE ATTACHED | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |
| | ☐ | ☐ | ☐ |

## PART II GENERAL APPRAISAL OF EMPLOYEE PERFORMANCE

Complete items 1 through 8 for all employees and Items 9 and 10 when applicable. Differences between ratings by employee and by supervisor must be discussed.

| | | | TO BE COMPLETED BY EMPLOYEE | | | TO BE COMPLETED SUPERVISOR | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | EXCEEDS EXPECTATIONS | MEETS EXPECTATIONS | NEEDS IMPROVEMENT | EXCEEDS EXPECTATIONS | MEETS EXPECTATIONS | NEEDS IMPROVEMENT | INSUFFICIENT OPPORTUNITY TO OBSERVE |
| 1. | JOB KNOWLEDGE: | Knowledge of duties and responsibilities as required for current job or position | ☐ | ☑ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 2. | PRODUCTIVITY: | Amount of work generated and completed as compared to amount of work expected for this job or position | ☐ | ☐ | ☑ | ☐ | ☐ | ☒ | ☐ |
| 3. | QUALITY: | Correctness, completeness, accuracy and economy of work - overall quality | ☐ | ☑ | ☐ | ☐ | ☐ | ☒ | ☐ |
| 4. | INITIATIVE: | Self motivation - amount of direction required - seeks improved methods and techniques- consistence in trying to do better | ☐ | ☑ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 5. | USE OF TIME: | Uses available time wisely - is punctual reporting to work - absenteeism — accomplishes required work on or ahead of schedule | ☐ | ☐ | ☑ | ☐ | ☐ | ☒ | ☐ |
| 6. | PLANNING: | Sets realistic objectives - anticipates and prepares for future requirements -establishes logical priorities | ☐ | ☑ | ☐ | ☐ | ☐ | ☒ | ☐ |
| 7. | FOLLOW-UP: | Maintains control of workloads - allocates resources economically - insures that assignments are completed accurately and timely | ☐ | ☐ | ☑ | ☐ | ☐ | ☒ | ☐ |
| 8. | HUMAN RELATIONS: | Establishes and maintains cordial work climate - promotes harmony and enthusiasm - displays sincere interest in assisting other employees | ☑ | ☐ | ☐ | ☐ | ☒ | ☐ | ☐ |
| 9. | LEADERSHIP: | Sets high standards - provides good managerial example - encourages subordinates to perform efficiently — communicates effectively | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 10. | SUBORDINATE DEVELOPMENT: | Helps subordinates plan career development — trains potential replacements - gives guidance and counsel | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ |

EMPLOYEE'S NAME — LAST, FIRST, MIDDLE
JOHNSON, RUFUS

## PART III. REMARKS BY SUPERVISOR

Document the ratings checked In Part I and II.

Comment on employee's outstanding achievements. When "not met" is checked In Part I or "needs improvement" is checked in Part II describe the reasons for this rating, and what remedial steps were taken.

SEE ATTACHED

## PART IV. EMPLOYEE OBJECTIVES FOR NEXT REPORTING PERIOD.

To be established by the supervisor with input from the employee. Objectives should be set for each major area of job responsibility, ranked in priority order, and be as measurable as possible. Personal development objectives may be included.

SEE ATTACHED

EMPLOYEE'S NAME — LAST, FIRST, MIDDLE
JOHNSON, RUFUS

## PART V. EMPLOYEE'S COMMENTS

Employee may comment on all or any part of the information contained in this document, including the evaluation process. If the Employee does not concur with the evaluation, check the appropriate box and explain reasons for disagreement.

## PART VI. SIGNATURES

EMPLOYEE'S SIGNATURE _Johnson_
_Rufus_

☐ I DO NOT CONCUR (USE/PART V FOR COMMENTS)

PAYROLL TITLE
CPI

DATE
4-26-01

SUPERVISOR'S SIGNATURE

☒ I HAVE PERSONALLY DISCUSSED THE CONTENTS OF THIS DOCUMENT WITH THE EMPLOYEE

PAYROLL TITLE
PSA

DATE
4/26/01

NEXT HIGHER LEVEL SUPERVISOR SIGNATURE (REVIEW)    PAYROLL TITLE _Becky Jones_ SPSA    DATE
_Jamie Ralph_ PSA. Child Protection Manager    4/26/01    4-26-01

AGENCY HEAD SIGNATURE (REVIEW) _Edward E Cotonis_ SPSA    DATE 5-21-01

## PART VII. QUARTERLY PROGRESS REVIEW. (This can be initiated by either the employee or the supervisor.)

The employee and supervisor may meet quarterly to review progress toward previously agreed upon objectives. If the original objectives need to be adjusted, use the space below to document the change. The employee and supervisor should date and initial the document at the time of each review.

| 1st quarter Date ___ Initials: Emp. ___ Sup. ___ | |
| 2nd quarter Date ___ Initials: Emp. ___ Sup. ___ | |
| 3rd quarter Date ___ Initials: Emp. ___ Sup. ___ | |

CMS201 (10-96) IL 401-0569

000022

Page 4 of 4

ATTACHMENT I
Rufus Johnson, 1/1/00-12/31/00

PART I:  APPRAISAL OF OBJECTIVES

1.  Initiate 100% of all investigations within 24 hours after receipt of report.  MET

2.  Complete 60% of investigations within 10 working days.  NOT MET

3.  Complete 75% of investigations within 30 working days.  NOT MET

4.  Complete 100% of reports within 60 working days (with the exception of approved extensions).  MET

5.  Achieve less than a 5% CANTS form denial rate.  MET

6.  Complete an average of 13 investigations per month unless reporting levels are insufficient.  MET

7.  No overdue reports.  MET

8.  The rate of indicated reports will fall within 5% of the yearly team average.  MET

9.  Investigative contacts with subjects of report and community contacts will be conducted in a professional manner.  NOT MET

10. 100% of DCP files will meet COA guidelines and DCP procedural requirements.  NOT MET

11. 100% of ceraps will be completed and submitted for supervisory signature within 24 hours.  MET

12. In person handoff referrals will be done according to local protocol.  MET

13. Attend and participate in all team meetings.  MET

14. Attend all mandated DCFS training insuring completion of 20 hours every 2 years.  MET

15. To pursue training regarding investigative/interviewing techniques regarding children and families.  MET

ATTACHMENT II
Rufus Johnson, 1/1/00-12/31/00

PART III: Remarks by Supervisor

This evaluation is based on the period from January 1, 2000 through December 31, 2000.
This is Mr. Johnson's seventh annual evaluation.

During the period of January 1, 2000-December 31, 2000, Rufus Johnson completed 163
investigations. Of these 163, 12.3% were priority one reports, 80.5% priority two, and
7.1% priority three. Mr. Johnson indicated 36.4% of these investigations and unfounded
63.6%. Over the above 12 month period, Mr. Johnson completed an average of 13.5
investigations per month, meeting this objective. The team indicated rate as of
December, 2000 was 31.5%. As reported, Mr. Johnson's indicated rate was 36.4 %,
which places him within 5% of the yearly team average, thus meeting this objective. It
should be noted Mr. Johnson's rate of indication appears to remain consistent as his
indicated rate for the previous evaluation period was .2% higher than this year's rate.

Mr. Johnson completed 27 % of his assigned reports within 14 days and 16.6% between
15 and 30 days, for a total completion rate of 43.6% within the initial 30 day time frame
of the investigation. This rate falls greatly short of the expected 75% completion rate
within the same time frame. Mr. Johnson had 26.4% of his cases extend between 31 and
60 days, with 30% extending 60 days and beyond. It should be noted the investigative
unit experienced staffing shortages over the past year and Mr. Johnson was over BH for
at least 7 months of year 2000. Please see attached BH count. Unfortunately, almost all
investigators in the Urbana Field Office experienced high workloads over this same
period of time. This does not completely justify Mr. Johnson's poor performance in this
area. Mr. Johnson did have investigations during this reporting period extended
according to procedures, with many reports needing extension for write up and because
he had not completed all contacts according to policy and procedure. Mr. Johnson
appears to have a tendency to set older reports aside and does not return to complete them
in a timely manner until approached by this supervisor regarding the progress of the
report. He experience difficulty in prioritizing his reports and time. Many times, Mr.
Johnson had completed all needed tasks for the investigation but did not take time to
write it up. Cases were left open (for writeup) and Mr. Johnson neglected to monitor the
case while it remained open or did not document any monitoring in the file. All CPI's
on the team were providing with regular pending lists and needed to discuss with the
supervisor why the report was not yet completed. For the most part, Mr. Johnson simply
had not finished writing up the report or had one outstanding contact to make, which
continued to be put aside to address newer reports. A cycle began to develop as once he
returned to old reports, the "new ones" were then put aside. The completion rate was also
a QI project for this team during the first half of the year 2000, but had to temporarily be
put aside as with staffing shortages and report increase, this was not an attainable goal,
however the trends in noncompletion were realized by the team.

000025

For the first six months of 2000, Mr. Johnson experienced great difficulty in completing reports and maintaining COA and DCFS procedural guidelines. In the case of M.S., Mr. Johnson did not see the child victim for 30 days. He continued to attempt to see the child at the residence knowing the child attended school and the name of the school. Reports in general contained many gaps in time between contacts, both with subjects and professionals. Mr. Johnson did not utilize the mail system to contact people and make better use of his time versus making several failed in person attempts, wasting time and energy. In the case of B.W. after the initial attempt, there was no in person contact for 6 weeks. The S.S. case had an almost 2 month gap in time between contacts and in this same case, the possibility of another child victim was not addressed. The K.P. case revealed no documented contact with service providers for 6 weeks. During the first 6 months of 2000, this same trend was observed in many of Mr. Johnson's investigations. In this same time period, documentation in files was poor. Required notifications and screening tools were missing from files. April, 2000, this supervisor and Mr. Johnson developed a corrective action plan to address these issues which included strict weekly supervision, "tag alongs" by the supervisor as Mr. Johnson made contacts, training on policy and procedure to all CPI's and refusal by this supervisor to sign off on reports until the investigation was in compliance with procedures and COA. This supervisor did note improvements in contacts, documentation, and completion rates by Mr. Johnson over the second half of the year, but it remained below standards , as evidenced in part by statistical outcomes. Mr. Johnson still needs monitoring to complete files in a timely manner.

Mr. Johnson passed his child welfare test and will be licensed. In addition he has attended outside training to improve his skills as an investigator. He attended a training presented by Robert Farley and sponsored by the Domestic Violence Council. He has attended all DCFS mandatory trainings and attends team meetings and supervision. Mr. Johnson is pleasant and always willing to help others in the office, sometimes to his detriment as his workload will take second place. He utilizes the computer and email system.

Of the eight employee performance objectives identified on the standard evaluation form, Mr. Johnson was rated meets expectations in the objectives of job knowledge, initiative, and human relations. He was rated needs improvement in the areas of productivity, quality, use of time, planning, and follow up.

Regarding initiative, Mr. Johnson worked with this supervisor to develop a corrective action plan to improve his work performance and skills. He has been willing to meet with this supervisor regularly and take direction, constructive criticism.

As stated previously, Mr. Johnson did not meet completion rate objectives, with almost one third of his cases (30%) extending beyond 60 days. Mr. Johnson's completion rate for this same category was only 9.8% the previous year. He did not complete the amount of work expected for this position even under stressful times, as evidence by other workers on the team receiving the same volume of reports, yet maintaining better

statistics and completion rates. Extreme gaps in contact time were noted in the files, As Mr. Johnson appeared to make initial attempts to see people and then went on to the next case, not following up in a timely manner. Time was not used wisely. Cases revealed much lost travel times in making repeated attempts to contact subjects, but alternative locations, such as schools were not utilized to make contacts along with using the mail service allowing wasted out of office time to be used to complete files.

Mr. Johnson is making efforts to improve his performance. As stated, he has operated under a corrective action plan, meets with this supervisor for direction, and is making a concerted effort to complete files and make all contacts in a timely manner while monitoring the case. Pending lists are dispersed to team members weekly so they may monitor along with the supervisor, the status of outstanding reports. Check lists have been developed to aid the CPI's in maintaining file compliance and to assist them in remembering all actions needing to be taken for specific types of cases. This supervisor provides training regularly at team meetings on policy and procedure and also reviews with all CPI's (including Mr. Johnson) any new policy and procedures which have been implemented. This supervisor will continue to work with Mr. Johnson on these issues over the coming year. Mr. Johnson has maintained a positive attitude and is supportive of his team mates. I am hopeful he will continue to improve his performance as he does take pride in his work and relationships with others.

## PART IV. EMPLOYEE OBJECTIVES FOR NEXT REPORTING PERIOD.
### Rufus Johnson, 1/1/00-12/31/00

1. Complete a minimum of 12 investigations per month unless report level is insufficient.
2. Complete 75% of investigations within 30 days.
3. Complete 100% of investigations within 60 days, barring approved extensions.
4. Initiate 100% of investigations within 24 hours of receipt of investigations.
5. Have no more than 5% of reports denied by SCR for errors.
6. Attend and successfully complete 50% of the minimum 20 hours of in-service education and training required to meet certification.
7. Give a minimum of one speech to the community regarding abuse and neglect.
8. Investigative contacts with subjects of the report and collateral contacts will be conducted in a professional manner.
9. Less than 2% of reports will be returned by the supervisor for procedural error which effects child safety or the outcome of the report.
10. During investigative process, effectively engage family and provide direct assistance as necessary in management/resolvement of family crisis, assessment of family needs, offering of appropriate services and facilitation of referrals of DCFS or community providers.
11. Complete referrals to community providers in a timely manner and to DCFS follow up services within established protocol time frames.
12. Prepare court petitions/documents and provide testimony as needed in a timely, appropriate and professional manner.
13. Complete a Child Endangerment Risk Assessment on all assigned SCR investigations within 24 hours after initial in-person contact with the alleged child victim(s) or whenever circumstances suggest a child's safety may be in jeopardy and document per agency procedure on a CFS 1441 Safety Determination Form. The CFS 1441 will be submitted to the supervisor for approval within 24 hours of completion of the safety determination.
14. Maintain COA standards.
15. Participate and support activities to achieve COA re-accreditation.
16. Participate in the peer review process and QI activities.
17. Participate in team/staff meetings and activities to support foster parents.

9CANNMD101

```
           ***** WARNING *****

      THE FOLLOWING IS A CONFIDENTIAL DCP REPORT
                              ==========

      WORKER PERFORMANCE
      FOR WORKER: JOHNSON, RUFUS
      FOR PERIOD: 01/01/2000  -  12/31/2000

TOTAL REPORTS              154
PERCENT DETERMINED         97.4%
PERCENT COMPLY            100.0%
PERCENT PENDING             9.4%
PERCENT COMPLETED          90.6%
PERCENT INDICATED          34.4%
PERCENT UNFOUNDED          65.6%
PERCENT  1-14 DAYS         27.0%
PERCENT 15-30 DAYS         16.6%
PERCENT 31-60 DAYS         26.4%
PERCENT 61-90 DAYS         23.3%
PERCENT 90+ DAYS            6.7%
PERCENT UNDETERM            0.0%
PERCENT PRIORITY 1         12.3%
PERCENT PRIORITY 2         80.5%
PERCENT PRIORITY 3          7.1%
PERCENT SEX ABUSE           7.1%
PERCENT SEX ABUSE PENDING   0.0%
PERCENT SEX ABUSE INDICATED 36.4%
PERCENT SEX ABUSE UNFOUNDED 63.6%
PERCENT SEX ABUSE UNDETERM  0.0%


NUMBER COMPLETED           163
NUMBER INDICATED            56
NUMBER UNFOUNDED           107
NUMBER  1-14 DAYS           44
NUMBER 15-30 DAYS           27
NUMBER 31-60 DAYS           43
NUMBER 61-90 DAYS           38
NUMBER 90+ DAY              11
NUMBER UNDETERM              0
NUMBER PRIORITY 1           19
NUMBER PRIORITY 2          124
NUMBER PRIORITY 3           11
NUMBER SEX ABUSE            11
NUMBER SEX ABUSE PENDING     0
NUMBER SEX ABUSE INDICATED   4
NUMBER SEX ABUSE UNFOUNDED   7
NUMBER SEX ABUSE UNDETERM    0
```

Page: 1 Document Name: untitled

NUMBER OF REPORTS ASSIGNED TO THE LISTED INVESTIGATOR -- 1998

PLEASE ENTER KEY INFORMATION:
WORKER ID:    006183        -    JOHNSON,RUFUS
TEAM:         3B  09        AS OF DATE:    04/24/01

| 01/00 | 02/00 | 03/00 | 04/00 | 05/00 | 06/00 | 07/00 | 08/00 | 09/00 | 10/00 | 11/00 | 12/00 |
|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|-------|
| 12    | 16    | 16    | 11    | 14    | 12    | 15    | 15    | 8     | 15    | 13    | 7     |

OVER BH?: YES

OVER BH = MORE THAN 15 REPORTS IN ANY MONTH DURING A CALENDAR YEAR.
    OR    MORE THAN 12 REPORTS IN ANY 4 MONTHS DURING A CALENDAR YEAR.

   F3: QUIT                                F12:CANCEL