# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See Privacy Act Statement before completing this form.

| AGENCY | CHARGE NUMBER |
|---|---|
| ☐ FEPA | |
| ☒ EEOC | |

**E-FILED**
Tuesday, 28 September, 2004 04:45:30 PM
Clerk, U.S. District Court, ILCD

Illinois Dept. of Human Rights
*State or local Agency, if any*                    and EEOC.

| NAME *(Indicate Mr., Ms., Mrs.)* | HOME TELEPHONE *(Include Area Code)* |
|---|---|
| Mr. Rufus Johnson | (304) 452-6967 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | DATE OF BIRTH |
|---|---|---|
| 1004 Samantha St. Apt. 2, Normal, IL 61761 | | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME *(If more than one list below.)*

| NAME | NUMBER OF EMPLOYEES, MEMBERS | TELEPHONE *(Include Area Code)* |
|---|---|---|
| IL Dept. Children & Family Services | Cat B (101-200) | (312) 814-6881 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 100 W. Randolph, Chicago, IL 60601 | | 031 |

| NAME | TELEPHONE NUMBER *(Include Area Code)* |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| | | |

CAUSE OF DISCRIMINATION BASED ON *(check appropriate box(es).)*

☒ RACE   ☐ COLOR   ☐ SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN
☐ RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ OTHER *(Specify)*

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | LATEST |
| 02/08/2001 | 12/12/2001 |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE *(If additional space is needed, attach extra sheet(s)):*

I began my employment with Respondent on or around December 10, 1993. My most recent position is Child Protection Investigator. On or about June 2, 2001 I was accused by a supervisor of violating a company policy and I was given discipline. My non-black co-workers violated the same policy and have never been disciplined. My job performance and work is constantly being scrutinized by my supervisors, while my non-black co-workers are not subjected to similar treatment.

I believe I have been discriminated against on the basis of my race, Black, in violation of Title VII of the Civil Rights Act of 1964, as amended.

DEC    2001

**EXHIBIT**

tabbies

B

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY - *(When necessary for State and Local Requirements)* |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| X ___12-18-01___     *Rufus Johnson* | |
| Date        Charging Party *(Signature)* | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE *(Month, day and year)*     000915 |

EEOC FORM 5 (Rev. 07/99)

RESPONDENT'S COPY

STATE OF ILLINOIS              )                    *Rufus Johnson v. IDCFS*
                               ) SS.
COUNTY OF Williamson           )                    USDC-CD Ill. No. 02-2260

## AFFIDAVIT

I, Nora Harms, being duly sworn and under oath, do state that I have personal knowledge of the following and if called to testify, would state as follows:

1.          I received a Bachelor's Degree in Psychology from the University of Illinois in 1993 and a Master's Degree in Social Work from the University of Illinois in December 1994.

2.          I began employment with the Illinois Department of Children and Family Services as a caseworker on May 10,1995 for the Urbana field office.

3.          I was promoted to Child Protection Supervisor of Team 3B09 for the Urbana field office in July of 1998, and remained at that position until November 21, 2001.

4.          As part of my duties as a Child Protection Supervisor, I was the immediate supervisor of Team 3B09 in the Urbana field office. My duties included planning, supervising, reviewing, and coordinating the activities of a team of child protection investigators engaged in providing child welfare and/or protective services to children and facilities; directing the Team Service Program within the existing framework of statutes and policies of the Agency; serving as liaison with other disciplines, agencies and community resources; establishing performance goals and objectives; preparing, conducting and signing performance evaluations; effectively



**EXHIBIT**

C

recommending and imposing disciplinary actions, and adjusting grievances.

5.         Cases were assigned to Child Protection Investigators in Team 3B02 and Team 3B09 based upon a rotational cycle. All members of both teams were placed on a list and cases were assigned in order of rotation.

6.         I was the immediate supervisor for Team 3B09.

7.         Between February 8, 2001 and December 12, 2001, the members of Team 3B09 were Carol Davis-Hargest, Heather Forrest, Rufus Johnson, and Lynda Morgan. Terry Walters, floater for the Champaign subregion was sporadically assigned to the team to assist with intake during this time.

8.         I supervised Carol Davis-Hargest, an African American female, from June of 2000 until November 21, 2001.

9.         I supervised Heather Forrest, a white female, from November of 2000 until November 21, 2001.

10.        I supervised Steven Bryson, a white male, from July 1998 until March of 2000.

11.        I supervised Rufus Johnson, an African American male, from July of 1998 until November 21, 2001.

12.        I supervised Stacey McAdams, an African American female, from July 1998 until December 15, 2000.

2

13.         I supervised Lynda Morgan, a white female, from February of 2001 until November 21, 2001.

14.         I supervised Joseph Simmons, a white male, from January of 2000 until October of 2000.

15.         I supervised Sandy Daniel, a white female, from July of 1998 until December, 1999.

16.         Team 3B02 was a separate team with a separate supervisor. Therefore, I have never supervised Marianne Pointer, Charles Cochran, Dave Harmon, Mike Fett, or Janis Warwick-Caffrey.

17.         I had the authority to pull investigators out of case rotation due to insufficient case work product.

18.         While I supervised Steve Bryson from February of 1999 to March of 2000, I periodically pulled Mr. Bryson out of case rotation due to his insufficient work performance.

19.         Steve Bryson left the Urbana field office in March of 2000.

20.         As Mr. Johnson's immediate supervisor, I independently evaluated Mr. Johnson's job performance.

21.         I told all of the investigators in Team 3B09 that they would be subject to discipline if they did not get their work done on time. (Exhibit A, page 38).

22.         Mr. Johnson never complained to me that he was being discriminated against or harassed based upon his race.

3

23.            I only have authority to recommend that a Child Protection

Investigator be hired, fired, promoted, demoted, or transferred.

FURTHER AFFIANT SAYETH NOT.

Official Seal
Madonna Spann
Notary Public State of Illinois
My Commission Expires 02/19/08

Nora Harms

Subscribed and sworn to before me this

*24th* day of September, 2004.

Notary Public

4

STATE OF ILLINOIS         )                    *Rufus Johnson v. IDCFS*
                          ) SS.
COUNTY OF _McLean_        )                    USDC-CD Ill. No. 02-2260

## AFFIDAVIT

I, Jamie Ralph, being duly sworn and under oath, do state that I have personal knowledge of the following and if called to testify, would state as follows:

1.          I received a Bachelor's Degree in Psychology from Southern Illinois University in 1989 and received a Master's Degree in Counseling from Eastern Illinois University in 1998.

2.          I began employment with the Illinois Department of Children and Family Services as a Caseworker in April of 1991 for the Springfield Field office.

3.          In February of 1992, I transferred to the position of Investigator for the Lincoln field office, and in April of 1992 transferred to the position of investigator for the Salem field office.

4.          In September of 1998, I was promoted to the position of Investigative Supervisor for the Olney field office.

5.          In March 2001, I was promoted to Child Protection Manager for the Champaign sub-region.

6.          I was the Child Protection Manager for the Champaign sub-region between March 1, 2001 and November of 2002.  During this time, I reported to my immediate supervisor Becky Jones.



**EXHIBIT**

D

7.          As Child Protection Manager I was responsible for the supervision of Child Protection Supervisors for the Danville, Charleston, Urbana, Pontiac, and Decatur field offices.

8.     I was the immediate supervisor for Nora Harms, the Child Protection Supervisor for the Urbana field office.

9.          Rufus Johnson was a Child Protection Investigator under the direct supervision of Nora Harms in the Urbana field office.

10     As Child Protection Manager my job duties were to read and approve investigations that involved DCFS wards, case extensions, reports concerning foster care homes, death investigations, and other special reports. During this time I also read such reports for Decatur, Charleston, Danville, and Pontiac field offices.

12.        11.    As a Child Protection Manager, I only have authority to make recommendations to hire, fire, promote, demote, transfer, or discipline.On April 25, 2001, Mr. Johnson was given an oral reprimand for disclosing confidential information involving a co-worker's child. (Exhibit G).

13.         As a Child Protection Investigator, Rufus Johnson was covered by the AFSCME Master Contract.

14.         On or about April 30, 2001, Rufus Johnson by and through his union, filed a grievance regarding his receipt of the oral reprimand for breach of confidentiality. (Exhibit H).

2

15.          After consulting with my supervisor, Becky Jones, and the DCFS Office of Labor Relations, a decision was made on or about May 23, 2001 to reduce Mr. Johnson's oral reprimand to a counseling session. (Exhibit I).

16.          Pursuant to Article IX, Section 1 of the AFSCME Master Contract, oral counseling is not considered discipline. (Exhibit J).

17.          Mr. Johnson filed an EEOC Charge of Discrimination on December 18, 2001. (Exhibit B).

18.          I was requested by the Office of Affirmative Action to respond to the EEOC charge filed by Mr. Johnson, and after conducting an investigation I submitted a written response on January 28, 2002. (Exhibit U).

19.          At no time prior to Rufus Johnson filing his EEOC Charge of Discrimination did Rufus complain to me that he was being discriminated against or harassed based upon his race.

20.          The Peoria and Springfield offices were not under my supervision nor the supervision of my immediate supervisor, Rebecca Jones.

21.          Mr. Johnson told me he was transferring to another office to be closer to friends in the Aurora area.

22.          At the time of Mr. Johnson's request to transfer on or about December of 2001, there were vacancies at the Peoria and Springfield

3

offices that would have been a similar commute as that from Bloomington

to Champaign.

FURTHER AFFIANT SAYETH NOT.

*Jamie Ralph*
Jamie Ralph

Subscribed and sworn to before me this

24th day of September, 2004.

Notary Public

OFFICIAL SEAL
JULIE JONES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 12/30/04

4

STATE OF ILLINOIS )
) SS.
COUNTY OF _McLean_ )

*Rufus Johnson v. IDCFS*

USDC-CD Ill. No. 02-2260

## AFFIDAVIT

I, Becky Jones, being duly sworn and under oath, do state that I have personal knowledge of the following and if called to testify, would state as follows:

1.       I received a Bachelor's Degree in Sociology from the University of Illinois in 1970 and a Master's Degree in Human Developmental Counseling from Sangamon State University in 1979.

2.       I began employment with the Illinois Department of Children and Family Services as a Social Worker Career Trainee on February 2, 1970.

3.       In January of 1971, I was promoted to Social Worker I.

4.       In September of 1974, I was promoted to Social Worker II.

5.       In July of 1987, I was promoted to Child Welfare Supervisor.

6.       In February of 1999, I was promoted to Field Service Manager for the Urbana and Danville field offices.

7.       In April of 2001, I was promoted to Assistant Regional Administrator for the Champaign sub-region.

8.       Rufus Johnson was a Child Protection Investigator (CPI) with the Illinois Department of Children and Family Services (DCFS) in Urbana, Illinois from December of 1993 until March of 2002. (Exhibit A, pages 7, 85).

9.       The Urbana field office is located in the Central Region of DCFS.



**EXHIBIT**

E

10.         The Central Region of DCFS is comprised of three sub-regions: Peoria, Springfield, and Champaign.

11.         The Champaign sub-region office provides services to sixteen counties including the cities of Decatur, Danville, Urbana, Bloomington, and Charleston. (Exhibit E).

12.         As Assistant Regional Administrator of the Champaign sub-region, my essential job functions were subject to management approval by the Regional Administrator. My job duties were to plan, develop, and administer the integration of a wide variety of direct service and support service functions into a comprehensive program of service delivery; formulate and direct the implementation of policies and procedures for program services; coordinate program services with other Departmental divisions and with other public and private agencies; prepare, justify, and administer the regional budget.

13.         I have no job duties for the Peoria or Springfield field offices.

14.         My immediate supervisor was Deb Kennedy, an African-American female. Deb Kennedy was the Regional Administrator for the Champaign sub-region until September 17, 2004.

15.         The Illinois Department of Children and Family Services has an anti-discrimination policy which is published in the employee handbook. (Exhibit R).

2

16.         The employee handbook explains that reports of discrimination

may either be filed internally with the Office of the Affirmative Action or

externally with the Illinois Department of Human Rights or the Equal

Employment Opportunity Commission.  (Exhibit R).

17.         I only have authority to recommend to my supervisor that an

employee be hired, fired, promoted, demoted, or transferred.

FURTHER AFFIANT SAYETH NOT.


*Becky Jones*
Becky Jones

Subscribed and sworn to before me this

24th  day of September, 2004.

Notary Public

```
OFFICIAL SEAL
JULIE JONES
NOTARY PUBLIC, STATE OF ILLINOIS
MY COMMISSION EXPIRES: 12/30/04
```

3

STATE OF ILLINOIS ) *Rufus Johnson v. IDCFS*
) SS
COUNTY OF __Ford__ ) ·USDC-CD Ill. No. 02-2260

## AFFIDAVIT

I, DAWN BACHTOLD, under oath, state that I have personal knowledge of the statements contained in this Affidavit, I am competent to testify and if called to testify, I would testify to the same as follows:

1.        I am employed by the Illinois Department of Children and Family Services (IDCFS) as a Public Service Administrator, Field Supervisor, in the Urbana field office.

2.        I received both my Bachelor's degree and Master's degree in Social Work from the University of Illinois-Urbana/Champaign.

3.        I also have received a child welfare license in 2000.

4.        I have been employed with IDCFS since April, 1994. I worked as a caseworker in the Paxton field office from April, 1994, to April, 1998.

5.        In April of 1998, I began working as a supervisor in the Urbana office.

6.        During 2001, my duties included supervising a team of eight follow-up Caseworkers who provided child welfare services to intact and placement families.

7.        Caseworkers' job duties include, but are not limited to, the development and evaluation of service plans, coordinating the delivery of services, ensure appropriate documentation of case activity, evaluates the effectiveness and appropriateness of services to maintain family



**EXHIBIT**

*F*

connectedness and achieve permanency for children with families.

8.          At no time from 1998 to 2001, did I supervise any Child Protection
Investigators.

9.          On or about April, 2001, there was an incident of inappropriate
disclosure of confidential information in the Urbana office involving Rufus
Johnson, Lisa Sanders, Pam Wendt, and Sonia Cully.

10.         On or about April 20, 2001, I administered counseling to three of
my immediate subordinates, Ms. Sanders, Ms. Wendt, and Ms. Cully,
regarding the appropriate disclosure of confidential information. *See*
(Exhibits, M, N, and O) attached to Defendant's Memorandum of Law.

11.         I did not have any role in the decision regarding what/if any
supervisory action would be taken with regard to Mr. Johnson, as he was
in a separate chain of command.

12.         I have never supervised Rufus Johnson.


FURTHER AFFIANT SAYETH NOT.

DAWN BACHTOLD


Subscribed and sworn to before me this _2 1 st_ day of September, 2004.

Notary Public


"OFFICIAL SEAL"
N. J. Fiorillo
Notary Public, State of Illinois
My Commission Exp. 08/07/2005

INTEROFFICE CORRESPONDENCE
ILLINOIS DEPARTMENT OF CHILDREN AND FAMILY SERVICES
URBANA FIELD OFFICE

DATE: April 25, 2001

MEMO TO: Rufus Johnson RJ (5-1-01)

FROM: Nora Harms

SUBJECT: Oral Reprimand

This is to confirm that on April 25, 2001, you were issued an oral reprimand concerning your breech of confidentiality during an investigation involving the child of DCFS employee LM.

Cc: Personnel File
    Union Representative
    Labor Relations

```
EXHIBIT
tabbies
G
```

386853



### AFSCME / State of Illinois
## CONTRACT GRIEVANCE

| | | | | | |
|---|---|---|---|---|---|
| **Employee's Name** | RUFUS JOHNSON | **Agency** DCFS | **AFSCME Local No.** 2971 | **Date Raised at Step 1** | 4-30-01 |

**Job Title** CHILD PROTECTION INVESTIGATOR  **RC** 17  **Facility or Office** URBANA FIELD OFFICE

**STEP 1 - Oral(Step**

*Nina Harris*                    5-1-01        5-1-01
_____          _____          ( Date of Discussion)
Signature of immediate supervisor acknowledging discussion of grievance.     (DATE)

**STEP 2** - (To be submitted within 5 work days after supervisor's answer given or due, whichever occurs first.)
**Statement of Grievance** (Include facts of the complaint, sections of the Agreement violated – if applicable, and relief requested):

Mr. Johnson received an unknown report on 4-16-01 for Allegation 74. He completed a Soundex and background check based on a license plate number that was provided on the second page of the CANTS 1.
He discovered the person the complaint was about was Sandra Reagan Gauze. She was a licensed DCFS foster parent. Mr. Johnson contacted the Licensing Representative, Cheryl Huffman and she accompanied him to Ms. Gauze's home. While at Ms. Gauze's home doing the investigation, Mr. Johnson discovered that one of the children named in the report was the child of a co-worker (Linda Morgan). Ms. Gauze was the babysitter for this child.

(Continued on separate page – attached)

**EMPLOYEE** _____   AFSCME hereby appeals
                      the grievance to Step 2 _____
                                        (Union Representative)        (DATE)

---

**Date received by Intermediate Administrator or Designee** _MAY 11, 2001_ ✻  (DATE)    _42R_ (INITIALS)

**Answer** (to be given within 15 working days of receipt - use attachment if additional space is required)    **Date settlement meeting held** _MAY 23, 2001_

To resolve grievance number 386853 without precedent or prejudice. Management agrees to reduce the oral reprimand to a counseling session for Mr. Rufus Johnson.

**The original second level meeting was held on May 18, 2001. At that time it was continued until May 23, 2001 with all in agreement of this.

> **EXHIBIT**
>
> H

**Signature** _____ Date 5/23/01
          (Employer Representative)

**Signature** _____ Date 5/23/0
          (Union Representative)

☑ Accepted by Union   ☐ Rejected by Union

---

**STEP 3 - To be submitted to Agency Head** (certified mail - return receipt recommended) within 15 working days after Step 2 answer was given or due, whichever occurs first. **Local must send copy to Council 31 (Include fact sheets, information and documentation with Union copy only.)**
**AFSCME hereby appeals the grievance to Step 3**    Signature _____ Date _____
                                        (Union Representative)

---

**STEP 4 - To be submitted to Director of Central Management Services within 15 days after Step 3 sign off.**
**AFSCME hereby appeals the grievance to Step 4.**   Signature _____ Date _____
                                        (Union Representative)

100728

DEPARTMENT OF CHILDREN AND FAMILY SERVICES

INTEROFFICE CORRESPONDENCE

DATE: May 23, 2001

TO: Rufus Johnson

FROM: Jamie Ralph, Child Protection Manager

RE: Counseling Session

On May 23, 2001, at 3:00 pm you received a counseling session regarding
confidentiality. It was discussed that information obtained during your official job
capacity is not to be shared with others either inside or outside the DCFS office.



**EXHIBIT**

I

000181

## Section 9. Union Orientation

The current practices with respect to Union orientation of new employees in those agencies where the Union conducts said orientation shall continue.

In those agencies which have orientation for new employees, the Union shall be permitted to conduct its orientation as part of the orientation program of new employees, the mechanics of which shall be determined pursuant to the Memorandum of Understanding entitled "Supplemental Agreements".

Such attendance by employees shall be on a voluntary basis and without loss of pay for the employees involved.

## ARTICLE VII

### Labor/Management Committee Meetings

For the purpose of maintaining communications between labor and management in order to cooperatively discuss and solve problems of mutual concern:

a) The head of each work location or his/her designee shall meet monthly with the appropriate Union committee representing this bargaining unit or, if the parties agree, combined meetings with other AFSCME bargaining units of the parties;

b) The agency head and/or his/her designees shall meet with the Union at least once every six (6) months;

c) The Department of Central Management Services shall meet with the Union at least once every six (6) months.

The above meetings shall be scheduled at a time, place and date mutually agreed upon. More frequent work location meetings may be held when necessary at the request of either party. Such meetings shall be conducted combining all bargaining units unless mutually agreed otherwise.

Each party shall prepare and submit an agenda to the other one (1) week prior to the scheduled meeting. Minutes shall be taken and forwarded to the parties. These meetings may be attended by a reasonable number of AFSCME staff representatives and Local Union representatives from facilities or work locations as designated by the Union. The six (6) month except past practice in regards to the number of employees for the RC-9 and RC-42 bargaining units shall prevail.

**(RC-42 only)**

Monthly labor management meetings may be attended by no more than three (3) bargaining unit employees and by a reasonable number of AFSCME staff representatives and local Union representatives from facilities or work locations as designated by the Union. The six (6) month agency labor management meetings may be attended by no more than six (6) bargaining unit employees, except that the Department of Natural Resources is allowed eight (8) bargaining unit employees. The state-wide six (6) month labor management meeting with the Department of Central Management Services shall be attended by no more than fifteen (15) bargaining unit employees.

**(RC-10 only)**

a) The head of each Agency or his/her designee shall meet quarterly with the appropriate Union committee representing this bargaining unit, or if the parties agree, combined meetings with other AFSCME bargaining units. Less frequent meetings may occur by mutual agreement of the parties;

[14]

b) The Department of Central Management Services shall meet with the Union as needed, however, such meeting shall normally not take place more frequently than once per year.

The above meetings shall be scheduled at a time, place and date mutually agreed upon.

Each party shall prepare and submit an agenda to the other two (2) weeks prior to the scheduled meeting. Minutes shall be taken and forwarded to the parties. These meetings may be attended by a reasonable number of AFSCME staff representatives and Local Union representatives from facilities or work locations as designated by the Union.

## ARTICLE VIII

### Work Rules

#### Section 1. Rules of Personal Conduct

The Employer has the right to establish reasonable rules of personal conduct and will notify the employees and the Union within ten (10) working days in advance of any new or modified rules of personal conduct.

#### Section 2. Procedural Work Rules

Prior to establishing or changing procedural work rules or regulations, such as off-duty uniform usages, absent or tardy call-ins, doctors' statements for absences, parking violations and other similar matters, the Employer shall meet with the Union in a timely manner for the purpose of consultation and negotiations. Such procedural work rules and/or regulations shall either be posted or otherwise made available to affected employees.

## ARTICLE IX

### Discipline

#### Section 1. Definition

A. The Employer agrees with the tenets of progressive and corrective discipline. Disciplinary action or measures shall include only the following:

a) Oral reprimand (RC-10 excluded);
b) Written reprimand;
c) Suspension (notice to be given in writing); and
d) Discharge (notice to be given in writing).

Disciplinary action may be imposed upon an employee only for just cause. An employee shall not be demoted for disciplinary reasons. Discipline shall be imposed as soon as possible after the Employer is aware of the event or action giving rise to the discipline and has a reasonable period of time to investigate the matter.

In any event, the actual date upon which discipline commences may not exceed forty-five (45) days after the completion of the pre-disciplinary meeting.

The parties recognize that counselling and corrective action plans are not considered disciplinary action.

B. All agencies, boards, and commissions with employees covered under the Master Contract shall implement an Affirmative Attendance Policy unless by mutual agreement the individual agency, board, or commission, and the Union mutually agree not to implement such Affirmative Attendance Policy. The parties agree to meet immediately upon the execution of the collective bargaining agreement in order to negotiate the

[15]

EXHIBIT J

specific provisions of an affirmative attendance policy for each agency, board, or commission under the collective bargaining agreement. Unless mutual agreement is reached not to implement an affirmative attendance policy, such negotiations shall be completed or existing agreements may be re-opened at the request of either party no later than October 1, 2000. If negotiations are not completed by such date, CMS and the Union will negotiate the affirmative attendance policy for the applicable agency, board or commission.

The Affirmative Attendance Policy shall include a specific schedule of discipline for absences; a program implementing a maximum served suspension period for actual suspension time pursuant to the policy; and, the below definition of acceptable medical certification for proof status:

a. Signature, address, and phone number of the medical practitioner;

b. The pertinent date(s) in question; and,

c. An indication that the employee was unable to work on the date(s) in question for reasons of personal or family illness.

Except as may be specifically excepted above, the procedures and use of time off for each agency shall remain in effect unless the parties negotiate alterations to existing policies and procedures.

## Section 3. Suspension Pending Discharge

The Employer may suspend an employee for up to thirty (30) calendar days pending the decision whether or not charges for discharge shall be filed against the employee and such actions shall not be subject to Article V, Grievance Procedure. If suspension pending discharge is replaced by another disciplinary action, written notice will be issued and such action may be subject to the grievance procedure.

## Section 4. Pre-Disciplinary Meeting

For discipline other than oral reprimands, the Employer shall hold a Pre-disciplinary meeting. Pre-disciplinary meetings and employee review hearings shall be held during the employee's worktime. If arrangements for such cannot reasonably be made, the hearing shall be rescheduled immediately preceding or immediately following the employee's shift on the employee's workday. An employee whose hearing begins after the end of his/her shift shall be paid from the end of his/her shift through the end of his/her hearing at the appropriate rate. An employee whose hearing begins before the start of his/her shift shall be paid from the time the hearing is scheduled through the start of the employee's shift at the appropriate rate. Should the hearing be postponed or rescheduled at the request of the employee and/or the Union at a time other than before, during, or after the employee's shift, provisions for payment shall not apply.

Prior to notifying the employee of the contemplated measure of discipline to be imposed, the Employer shall notify the Union of the meeting and reasonably in advance of such meeting shall provide the Union with documentation and shall make every reasonable effort to provide all documentation being used by the Employer to substantiate the alleged infraction. The Employer then shall meet with the employee involved and inform him/her of the reasons for such contemplated disciplinary

action including any names of witnesses and copies of pertinent documents. Employees shall be informed of their rights to Union representation, which shall be entitled to such, if so requested by the employee, and the employee and Union representative shall be given the opportunity to rebut or clarify the reasons for such discipline.

Reasonable extensions of time for rebuttal purposes will be allowed when warranted and if requested. If the employee does not request Union representation, a Union representative shall nevertheless be entitled to be present as a non-active participant at any and all such meetings. Except for discipline pursuant to an agreed upon time abuse policy, the current procedure for pre-suspension/pre-separation hearings in Cook County Public Aid shall continue, unless amended by the parties in supplemental negotiations.

## Section 5. Oral Reprimands

In cases of oral reprimands, the supervisor must inform the employee that he/she is receiving an oral reprimand and of their right to Union representation, which shall be provided, if so requested. The employee shall also be given reasons for such discipline, including any names of witnesses and copies of pertinent documents. Notations of oral reprimands may be placed in the employee's personnel file.

## Section 6. Notification and Measure of Disciplinary Action

a) In the event disciplinary action is taken against an employee, other than the issuance of an oral reprimand, the Employer shall promptly furnish the employee and the Union in writing with a clear and concise statement of the reasons therefore. The measure of discipline and the statement of reasons may be modified, especially in cases involving suspension pending discharge, after the investigation of the total facts and circumstances. But once the measure of discipline is determined and imposed, the Employer shall not increase it for the particular act of misconduct which arose from the same facts and circumstances. The Employer shall make a reasonable effort to notify an employee of his/her suspension prior to its effective date.

b) An employee shall be entitled to the presence of a Union representative at an investigatory interview if he/she requests one and if the employee has reasonable grounds to believe that the interview may be used to support disciplinary action against him/her. Such Union representative may be present during an investigatory interview for the purpose of protecting an employee's rights under the Collective Bargaining Agreement; however, such Union representative shall not act in such a manner so as to obstruct the investigation. It is understood by the parties that an employee's statement, either oral or written, made in investigatory interviews when representation is requested by the employee and denied shall not be used against him/her in any subsequent disciplinary action. Following such an investigation the employee and the Union shall be notified in writing that the investigation is complete. If an investigation of alleged employee misconduct does not lead to discipline, the investigation shall be closed and further will not become part of the employee's permanent file nor be used to adversely affect the employee's contractual rights.

c) Nothing in this Section shall prevent the Employer from relieving employees from duty in accordance with its practice. The employee shall not lose any wages because of such release.

[17]

## Section 7. Removal of Discipline

Any written reprimand or discipline imposed for tardiness or absenteeism shall be removed from an employee's record if, from the date of the last reprimand or discipline, two (2) years pass without the employee receiving an additional reprimand or discipline for such offense. The two (2) year period shall be extended by any leave of absence or disciplinary suspension. Any reprimand for other causes shall be removed from the employee's record based on the above criteria. Such removal shall be at the request of the employee but in any case shall not be used against the employee.

## Section 8. Polygraph

No employee shall be required to take a polygraph examination as a condition of retaining employment with the Employer nor shall be subject to discipline for the refusal to take such. An AFSCME representative may accompany a bargaining unit employee to a polygraph examination. The representative may review the polygraph questions but may not be present during the administration of the polygraph examination.

## ARTICLE X

### Vacations

## Section 1. Amounts

Employees, except emergency, temporary and those paid pursuant to Part II, Section 3 of the Pay Plan, shall earn vacation time. No employee on leave of absence may earn vacation except when the leave was for the purpose of accepting a temporary working assignment in another class.

Eligible employees shall earn vacation time in accordance with the following schedule:

a) From the date of hire until the completion of five (5) years of continuous service: ten (10) work days per year.
b) From the completion of five (5) years of continuous service until the completion of nine (9) years of continuous service: fifteen (15) work days per year.
c) From the completion of nine (9) years of continuous service until the completion of fourteen (14) years of continuous service: seventeen (17) work days per year.
d) From the completion of fourteen (14) years of continuous service until the completion of nineteen (19) years of continuous service: twenty (20) work days per year.
e) From the completion of nineteen (19) years of continuous service until the completion of twenty-five (25) years of continuous service: twenty-two (22) work days per year.
f) From completion of twenty-five (25) years of continuous service: twenty-five (25) work days per year.

Probationary employees earn vacation and may use such during their original six (6) months probationary period at the discretion of their Employer. Employees must be in paid status at least one-half (1/2) of the work days of the month to be credited for their earned vacation for that month.

## Section 2. Vacation Time

Vacation time may be taken in increments of not less than one-half (1/2) day at a time, and any time after it is earned. Supervisors may

[18]

---

however, grant employee requests to use vacation time in smaller increments of one-half (1/2) hour after a minimum use of one (1) hour. Vacation time shall not be accumulated for more than twenty-four (24) months after the end of the calendar year in which it is earned.

Vacation time earned shall be computed in workdays.

After an employee's earned vacation time has been so computed, if there remains a fractional balance of one-half (5/10) of a workday or less, the employee shall be deemed to have earned vacation time of one-half (5/10) of a workday, in lieu of the fractional balance; if there remains a fractional balance of more than one-half (5/10) of a workday, the employee shall be deemed to have earned a full workday of vacation time in lieu of a fractional balance.

Such rounding off of fractional balances shall only be done upon an employee's request for vacation days in increments of five (5) or more. However, no employee shall accumulate more than one (1) day per calendar year by rounding off under this Section.

## Section 3. Interrupted Service

Computation of vacation time of State employees who have interrupted continuous State service shall be determined as though all previous State service which qualified for earning of vacation benefits is continuous with present service. The rule provided in this paragraph applies to vacation time earned on or after October 1, 1972.

## Section 4. Part-time and Intermittent Employees

Part-time employees shall earn vacation in accordance with the schedule set forth in Section 1 of this Article on a pro-rated basis determined by a fraction the numerator of which shall be the hours worked by the employee and the denominator of which shall be the normal working hours in the year required by the position. Intermittent employees shall earn vacation in accordance with the current practice.

## Section 5. Vacation Schedules

Subject to Section 6 and the Employer's operating needs, vacations shall be scheduled as requested by the employee in writing. The Employer shall respond to vacation requests within five (5) work days. Where current practice provides for a quicker response, it will only be cancelled if the Employer's operating needs require that employee's services. The necessity of an overtime assignment shall not be a consideration in the cancellation of approved vacation. In any event, upon request, vacation time must be scheduled so that it may be taken no later than twenty-four (24) months after the expiration of the calendar year in which such vacation time was earned. If an employee does not request and take accrued vacation within such twenty-four (24) month period, vacation earned during such calendar year shall be lost. Except that the period of time an employee is on an approved leave of absence pursuant to Article XXIII, Leaves of Absence, shall not count toward the twenty-four (24) month period.

## Section 6. Vacation Schedules by Seniority

By January 31 of each calendar year, employees may submit in writing to the Employer their preferences for different time periods for vacation, provided an employee may not submit more than three (3) preferences. Such request may include vacation through the end of February of the following calendar year. In establishing vacation schedules, the Employer shall consider both the employee's preference and the operating needs of

[19]